## MATTERS v. MANUFACTURERS' TRUST CO. et al.

### No. 55.

Circuit Court of Appeals, Second Circuit.
Nov. 16, 1931.

On Rehearing Jan. 4, 1932.

Shaine & Weinrib, Schechter & Lotsch, and Edward B. Levy, all of New York City (Edward C. Weinrib, of New York City, of counsel; George C. Levin, of New York City, on the brief), for Thomas H. Matters.

Jonas & Neuburger, of New York City (Murray L. Jacobs and Leonard G. Bisco, both of New York City, of counsel), for Manufacturers' Trust Co.

Carl J. Austrian, of New York City (Warren C. Fielding and Ralph A. Newman, both of New York City, of counsel), for Municipal Bank and Trust Co.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The R. B. Rose Co., Inc., was a retail seller of radio machines; it was organized in September, 1924, and expanded quickly, but by the autumn of 1927 its fortunes started to wane, due to a change in the market, which began to demand radios that could be used with ordinary domestic current, in-

stead of being equipped with a battery. The company dealt in the old machines, and in October its sales fell to about $300,000 as against twice that amount for the preceding year; in November to $430,000 against $646,000; in December to $600,000 against $750,000; and in January, 1928, to $215,000 against $470,000. Thus for the four months its total sales had been only sixty per cent. of the year before, though its overhead had not been correspondingly reduced. The District Judge found, and the defendants do not dispute, that on January 31, 1928, this had brought about an insolvency in the sense that a fair valuation of the assets would not pay the liabilities. The balance sheet prepared as of that date showed, it is true, apparent assets of $887,000 and liabilities of $746,000; but of the assets the merchandise inventories accounted for about $560,000, of which not more than forty per cent. could be recovered, unless the business went on for a period of two or three years. The net worth of the assets should therefore be decreased by about $330,000 and, as there were also accounts of about $43,000 which were not collectible, the deficiency was not far from $250,000. Rose was the president and manager, and he kept daily track of the sales; but it is in dispute when he learned of the financial condition at the end of January. His bookkeeper gave him on February eighteenth a statement as of January thirty-first, or December thirty-first, and it seems to have been assumed by all parties that it was the first, though, so far as we can see, this is uncertain except for the improbability that it should take nearly seven weeks to draw off such a statement. However, even if the statement which he got was as of December thirty-first, it would make no difference, because though this showed assets of over a million dollars and liabilities of eight hundred thousand, there was nevertheless a deficiency, similarly calculated, of about $160,000. Whichever it was, it satisfied Rose that if he could not finance his company by outside means, he was at the end of his tether. He knew that he could not get any further renewals of notes, aggregating $125,000, which would fall due within ten days.

The company had three bank accounts, one of which plays no part here. Another was with the Capitol National Bank, and went back a long time. This was the bank which held the two notes, one of $25,000 maturing on the fourteenth of February, and the other, of $100,000 on the twenty-seventh. It also held four trade acceptances

drawn by a defendant, the Freed-Eisemann Company, aggregating about $44,000, and accepted by the Rose Company for merchandise purchased. These fell due between the sixth of April and the seventeenth of May. Freed and Eisemann together held about one-third of the Rose Company stock, and had a representative upon its board, and Rose knew that the Capitol Bank held this paper. On January sixteenth he opened another account with the Seventh National Bank, with which he had coquetted a little in the preceding summer, and which held two more of the Freed-Eisemann acceptances, which were of long standing, had been paid in part and renewed, and which aggregated about $30,000, and fell due on April tenth and thirteenth. Rose also knew that this bank held these. Upon his knowledge as to the place of discount of all the acceptances, Austrian's testimony is conclusive in spite of Rose's equivocation. On the first of February he had $60,000 of overdue merchandise bills, and merchandise notes of about $260,000, counting the acceptances just mentioned; $71,000 on deposit with the Capitol Bank and $26,000 in the Seventh.

The smaller of the two notes held by the Capitol Bank was paid on the fourteenth, when it fell due, by charging it off against the company's balance. The account on the thirteenth had been $34,000 and remained substantially unchanged after the charge, because of a deposit of a little over $25,000 on that day. Rose was continually using it for his needs, paying a few of his creditors out of it, though keeping off most after the tenth, in spite of some pressure. The account fell to $30,000 on the sixteenth, but thereafter grew daily with one exception, until, on the twenty-fifth, it had reached $128,000. On the twenty-seventh the bank charged off the second note of $100,000 then due, and the account later fell from $25,000 on that day to $22,000 on March fifth. Thereafter it again grew till on the sixteenth it was $53,000, and closed at $44,000 on the seventeenth, the day when the company filed a voluntary petition. Thereupon the bank exercised its right to accelerate the four trade acceptances, and paid them off, leaving a small balance, which was turned over to the bankruptcy receiver. The case against it was based upon the theory that payment of both notes and of trade acceptances were preferential transfers under section fifteen of the New York Stock Corporation Law, Rose having built up his deposits with intent not to draw them down

below the necessary amount to cover his debts until their maturity or his bankruptcy. At the time when these transactions took place, the statute charged the transferee without regard to notice; it has since been changed.

The deposit in the Seventh Bank, fluctuated between $26,000 at the beginning of February, and $4,700 on the fourteenth. It grew to $24,500 on the seventeenth, but fell to $7,000 on March first, where it remained until the eighth, between which time and the bankruptcy it rose to $40,000—$10,000 more than enough to cover the two trade acceptances. This bank adopted a different course from the Capitol. It did not at once charge off the deposit against the acceptances, but placed it in a special account, until they fell due, when it charged them against it, after presenting them for payment to the Freed-Eisemann Company, and upon dishonor, protesting them in due course. It does not indeed definitely appear that it did this in the case of both; the only notice of protest in evidence is that of the acceptance falling due on April eleventh. The parties seem however to assume that the same course was taken as to the second.

On February twentieth Austrian, who was the bankrupt's vice president and had charge of the selling, suggested to Rose that they sound out the Davega Company, with a view to taking over the insolvent and assuming its indebtedness. Negotiations were opened and went along until March sixth, when they substantially ended in Davega's offer to pay thirty-three per cent. of the claims, or fifty per cent. in its own stock, though they flickered along to final extinction on the ninth. It is the position of the banks that while they lasted, their pendency contradicted Rose's preferential intent.

On either the twenty-third or the twenty-seventh—the date being uncertain—Rose and Eisemann had a conference at the home of Eisemann's father, who was a director in the Capitol Bank. Eisemann had already heard of the Davega negotiations and the purpose of the interview was probably to discuss the bankrupt's affairs and what kind of showing it could make. The parties had before them a schedule showing the total accounts payable on February twenty-third amounting to $620,000, also a notice from the bank that the note of $100,000 would be due on the twenty-seventh, and a statement of the bank balances as of the twenty-third, $150,000.

Upon these facts the District Judge charged the bankrupt with an intent to prefer only after February twenty-seventh, the date of payment of the second note, credited the banks with the accounts on that day and charged them with the final balances. This resulted in a small recovery against each. The Capitol Bank had merged meanwhile into the Manufacturers' Trust Company and the Seventh into the Municipal Bank & Trust Co., who are the defendants. The Municipal Bank & Trust Co. was in turn merged with the Bank of the United States; but all these mergers we may disregard for simplicity. The judge charged the Freed-Eisemann Company, which had meanwhile gone into receivership, with the same amounts. The plaintiff and the two banks appealed.

■ Deposits in a bank which holds a depositor's paper, may be a preference under section 15 (Stock Corporation Law N. Y. [Consol. Laws, c. 59]); we so held in Kolkman v. Mfrs. Trust Co., 27 F.(2d) 659. The defendants in effect ask us to overrule that decision, relying upon New York County Nat'l. Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199, 48 L. Ed. 380; Studley v. Boylston Nat'l. Bank, 229 U. S. 523, 33 S. Ct. 806, 57 L. Ed. 1313; our own decision in Murray v. Corn Exchange Bank (D. C.) 31 F. (2d) 373, affirmed (C. C. A.) 31 F.(2d) 375, and several other decisions. It is true, as these hold, that a deposit made in ordinary course of business, over which the depositor means to keep full control, is not a preferential transfer. The Bankruptcy Act (11 USCA) and section 15 after its amendment (Laws 1929, c. 653) charge the transferee only when in privity with the transferor; and, in a case like this, if there is to be a recovery, the bank must understand that the account is being built up so as to be available at the proper time for seizure. However, under section fifteen before its amendment no proof of such participation was necessary, and it was enough that the depositor alone intended not to use his right of withdrawal until the bank's right ended it. The deposit becomes a transfer because the depositor means it to be such; that is, he means not to exercise his right of withdrawal as to all of it, but to leave some part until that right is gone. It is not necessary that the residue shall be determinable in advance; no more need appear than that some part shall be left. When this is so the deposit is not in ordinary course; the part unused becomes a preferential payment when seized by set-off.

In the case at bar we can beyond any question fix Rose's knowledge of his insolvency as early as February eighteenth, when he got the statement, and on all the proof we think that it should be put back at least a week earlier. He began on the tenth to stop payment of his ordinary bills as they fell due; he even refused to sign routine cheques prepared for that purpose. They were payable according to his custom on that day, and as a result the unpaid accounts went up from $56,000 to $129,000. The first note was due in four days and it was absolutely necessary that it should be paid. His aggregate balances on the tenth had fallen from $86,000 to $41,000, and his insolvency was imminent in the sense that he could not pay in due course; indeed he was in that sense insolvent already. His chance of surviving depended upon how far his sales had picked up and of these he learned from day to day. The season was approaching when business was always bad; he had substantially run through the period when he could hope to recoup, and it had failed him. Some of his testimony indeed lends support to the plaintiff's argument that he had concluded nearly four weeks earlier that he could not pull out, but at best we can defer that time no later than the tenth. In these circumstances we think that his deposit of $25,574 on the fourteenth was made with preferential intent; that it was intended to pay the note admits of no doubt, the balances before and after it, were substantially the same.

Now it is true that on the fourteenth the bank had a right of set-off against the existing balance of $32,000. It was, so to say, in the position of a bona fide purchaser to that extent, and the preferential payment should not for this reason be recovered. This was the ruling in Kolkman v. Manufacturers' Trust Co., though to be sure the note there was not due when paid. But it really makes no difference here that we cannot treat that payment as a preference; because if the note be charged against the pre-existing balance, it must be regarded as reduced pro tanto, and the payment made on the fourteenth becomes a deposit against the note of $100,000 due on the twenty-seventh. So long as it was made with intent to prefer, it is immaterial whether it be allocated to the first note or to building up the account against the second. On the sixteenth the balance had fallen to $30,000, but the bank is entitled to that credit only if it is charged with the $25,000 note. If not, the balance must be regarded on that day as $5,000. The account itself shows beyond fair question that between the sixteenth and the twenty-seventh Rose was building it up to meet the second note. Though he was using it generally for his needs, it grew steadily till there was left on the twenty-seventh only $25,000, which, with $11,000 in the Seventh, was not a large working balance. However viewed, we find that he had preferred the Capitol Bank to the extent of $95,000.

We have not considered the effect of the Davega negotiations. Austrian first suggested these to Rose on the twentieth and they were shortly thereafter under way. It does not appear that they ever gave any prospect of paying creditors in full, nor indeed that Rose so supposed, though he says he always had hopes of them. When the Davega Company did make an offer on March sixth, it was to pay only one-third of the debts in cash, and the most visionary hopes were gone. Even at the outset their possibilities did not contradict Rose's preferential intent; they offered only an odd chance which we do not believe he took for more. It is still a preference if a debtor, knowing that he is insolvent, selects one creditor, though he believes that he may not go to the wall, if the dice fall right. He must actually believe that the gods will smile; it is not enough that their faces are inscrutable. It is clear here that Rose could not, and did not, know what the result of the negotiations would be.

Coming now to the acceptances, we think that the Capitol Bank has a defence under Perry v. Van Norden Trust Co., 192 N. Y. 189, 84 N. E. 804. It had no notice of the preference and charged the acceptances in good faith against the account; by so doing it lost its rights over upon the endorsement. There is no sufficient evidence that Eisemann knew of Rose's accumulation of deposits after March sixth, when they began to pile up, or of Rose's intent to prefer him. Whether that would have been enough to excuse the bank from giving him notice, under the doctrine of Kolkman v. Manufacturers' Trust Co., we need not decide. He no doubt knew of the breakdown of the Davega negotiations and of the insolvency of the bankrupt, but that was not to know that the payment of his acceptances was invalid, and that the bank would have a claim over against his company. That much at least must be shown to prevent his discharge as drawer. As res integra, it is true, we might hold the bank on the theory that aft-

er payment it could by subrogation pursue the drawer, not upon the note, but upon the claim which the trustee had against him, a right equivalent to that which it lost upon the endorsement. We may not however adopt such a theory because it would be in the face of the interpretation of the section adopted in Perry v. Van Norden Trust Company, which is authoritative upon us. Hence we hold that the Capitol Bank is not liable for the deposits made after March sixth and used to pay the acceptances.

■ The case stands otherwise as to the Seventh Bank, which reserved its rights against the Freed-Eisemann Company by notice and protest of the first draft, holding the deposit in special account meanwhile. Though, as we have said, it does not appear with certainty that it did the same as to the second, that makes no difference. It had already declared by its conduct that it did not treat the deposit as immediate payment and that it regarded the drawer as liable. If it failed to follow up its understanding in the second case, the fault was its own; it cannot be deemed a bona fide purchaser. The lowest which the account reached was about $7,000 between March first and eighth, after which it was quickly filled to $40,000 by the seventeenth, with very trifling withdrawals meanwhile. The bank is entitled to its set-off of the lowest sum, but is accountable for the difference between that and the face of the acceptances.

■ We think the Freed-Eisemann Company liable to the plaintiff for the four acceptances paid by the seizure of the balance by the Capitol Bank. This, coupled with the failure to give notice of dishonor, discharged it of its liability as drawer. As the payment was the occasion of the failure to charge it as drawer, it was the beneficiary, and the money was paid to its use. Section 15 does not limit recovery to the transferee; indeed it says nothing about recovery at all, leaving the results of the invalidity of the transfer for the courts to work out. We see no inconsistency in saying that the transfer was valid as to the bank and invalid as to the drawer, when one was a bona fide purchaser and the other was not, so long as both were "particular" creditors, intended to be preferred, as they were. Were we to limit the recovery to the transferee, it would be easy to defeat the purpose of the section, for the result would clearly be to prefer the drawer. While we cannot indeed say that the defence to the drawer's obligation was transferred to him by the

insolvent company, in substance that was the effect of the payment, for it was that, coupled with the bank's inaction arising from it, which created the defence. It seems to us that the statute must cover such a case, and we therefore hold the Freed-Eisemann Company liable for the amount of the preferential deposit; that is, the difference between the amount of the acceptances and the balance on March 6, $22,000.

■ Its liability upon the Seventh Bank's acceptances is in the end the same, though it rests upon somewhat different conceptions. As to those with which it was charged by notice of dishonor, a direct liability was established running from it as drawer to the bank. This was discharged by the money, not of the Rose Company, but of its creditors, because section 15 in substance affected with a constructive trust any assets paid with preferential intent. The creditors through their trustee, have therefore a right in subrogation against the drawer upon his obligation fixed under commercial law, but paid with money of the constructive trust. This does not however affect the liability of the Seventh Bank arising for the reasons already stated. It is true that as between it and the drawer, it is surety and the drawer principal. But while this will of course prevent the plaintiff from obtaining more than one entire recovery against both, it does not prevent a full claim against each, both being insolvent. As to the second acceptance if that was not protested, this reasoning does not apply; the drawer was never charged by the holder, the bank, according to commercial law. The plaintiff cannot be subrogated to an obligation which never became absolute. But the drawer is liable nevertheless as in the case of the Capitol Bank acceptances and for full value. In effect therefore the result is the same in each case; both the drawer and the bank are liable for the full amount, the plaintiff being limited to one full recovery, and the dividends of the drawer serving to exonerate the bank though not to reduce the face of the plaintiff's claim against it.

■ There remain only two questions: Whether section 15 applies to a corporation which has not defaulted upon its negotiable paper; whether the amendment is retroactive. As to the first, Caesar v. Bernard, 156 App. Div. 724, 141 N. Y. S. 659, affirmed on opinion below in 209 N. Y. 570, 103 N. E. 1122, is a complete answer and authoritative upon us. The first sentence of the statute is indeed limited to corporations which have so

defaulted (Tierney v. Dowd, 238 N. Y. 282, 144 N. E. 583; Karasik v. People's Trust Co. [D. C.] 252 F. 324, affirmed 252 F. 337 [C. C. A. 2]); but there are reasons for distinguishing between the two. At any rate the distinction has been made, and Tierney v. Dowd certainly did not mean to overrule Caesar v. Bernard. Judge Hazel held the amendment retroactive in Miceli v. Morgano (D. C.) 36 F.(2d) 507, but his reasoning does not satisfy us. The defendant's arguments are various: that the statute is penal; that it touches only the internal organization of a corporation; that it does not concern vested rights. None is valid. The purpose was to compel an equal distribution of an insolvent's assets, regardless of the good faith of the preferred creditor, unless he were a bona fide purchaser; the section had been on the books for a century. It was an understandable notion with much to commend it, though it has now yielded to the conceptions underlying the Bankruptcy Act, better adapted no doubt to the fluidity of financial dealings. It was, however, never a penal statute and by no possibility can it be so regarded; the transferee suffers no loss, but is put back where he was when insolvency occurred. Nor had it anything to do with the internal affairs of the corporation; it chances to be limited to corporate insolvents but it is none the less merely a rule for the distribution of assets among those, who by no stretch can be considered members of the association. That it vests rights in the creditors is too plain for argument.

■ The general rule in New York, as elsewhere, is that statutes, not procedural, are not to be read retroactively. People ex rel. Peaks v. Board of Supervisors, 43 N. Y. 130; N. Y., etc., R. R. v. Van Horn, 57 N. Y. 473; Rhodes v. Sperry & Hutchinson Co., 193 N. Y. 223, 85 N. E. 1097, 34 L. R. A. (N. S.) 1143, 127 Am. St. Rep. 945; Jacobus v. Colgate, 217 N. Y. 235, 111 N. E. 837, Ann. Cas. 1917E, 369; Orinoco Realty Co. v. Bandler, 233 N. Y. 24, 134 N. E. 823. None of the cases cited by the defendants require comment except perhaps Matter of Morse, 247 N. Y. 290, 160 N. E. 374. That concerned the effect of an amendment to the Stock Corporation Law of New York by which the power to set up voting trusts was taken from banks. The court held the amendment retroactive because it did not touch property rights, but the internal organization of the corporation; and especially because it prevented shareholders from joining the trust after the amendment was passed. If prospective, it would thus create a closed class—those who had joined before the amendment—which was contrary to the only policy that tolerated such arrangements at all. It is apparent that the decision can have no bearing on a situation like that at bar.

■ In the figures we have used we have taken the accounts as they stood on the company's books, not on the banks'; the difference, which is very substantial, arises from outstanding cheques. The banks' rights of set-off had not yet arisen; they had no present lien upon the accounts, and the question is to be determined by Rose's intent when he made the deposits after February tenth. When a depositor having an adequate account draws cheques upon his bank, he understands that they will be charged against it as it then stands. He does not know when they will be presented, nor does he consider future deposits as a means for their payment. Such an intent must be proved, if it is asserted. Hence when Rose made the preferential deposits he intended them to be used to build up his accounts, except as he should thereafter draw against them. The credit properly available to the banks is therefore the lowest balance as shown by the company's books after February tenth, in the case of the note, and after March sixth in the case of the acceptances. We have given the figures with enough accuracy to fix the precise recovery.

Decree reversed, and cause remanded for further proceedings in conformity with the foregoing.

On Petition for Rehearing by the Manufacturers' Trust Company.

PER CURIAM.

We find only one thing which the petition requires us to say, and this does not require a rehearing. In estimating the amounts with which the bank was to be credited, we took the balance as shown on Rose's books, not on the bank's. This we did because, in estimating that part of his deposits after the critical date which should be regarded as preferential, we held that he must be understood to have assumed that his outstanding checks would be paid out of the balances then at hand. The bank now argues that it may appear that some of the items appearing on his books as debits had not in fact been presented, when the larger note was paid. We did not of course pass upon that possibility, and

our opinion is not to be taken as foreclosing the bank from proving that there were such items. If there be any, the question will present itself to the District Court whether they are proper credits to the bank. In view of the fact that this question has not been argued, and that it may never arise, we will not pass upon it now, but leave it to the disposition of the District Court.

We take this occasion to correct an error in our opinion which was not noticed in the petition. We said that it was a matter of indifference whether the deposit of $25,575, made on February 14th, was applied to the $25,000 note due that day, or whether that note was charged against Rose's balance. If the note be charged against the balance, that balance fell to $9,000, below which it never went; if, on the other hand, it be charged against the deposit of that day, the lowest balance was $30,000 on the 16th. We think that it must be charged against the balance, not the deposit. The note being due, the bank's right to payment by set-off was absolute. There is nothing to deprive the bank of this right, now that the transaction is to be unraveled. If the lowest balance were treated as $9,000, the preferential deposits were $91,000; if the $25,000 note were treated as paid preferentially, the total preferences were $95,000. The bank is entitled to the first alternative.

Except as set forth above, we make no change in our former disposition of the case.