# TWENTIETH STREET BANK v. GILMORE.

## In re KEISTER MILLING CO.

### No. 3621.

Circuit Court of Appeals, Fourth Circuit.
June 11, 1934.

W. K. Cowden, Jr., and W. K. Cowden, both of Huntington, W. Va., for appellant.

E. L. Hogsett, of Huntington, W. Va. (Daniel Dawson, of Huntington, W. Va., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and WEBB, District Judge.

PARKER, Circuit Judge.

This is an appeal from an order of the District Judge confirming an order of a referee in bankruptcy, which summarily directed the Twentieth Street Bank of Huntington, W. Va., to pay over to the trustee in bankruptcy of the Keister Milling Company the sum of $2,690.58. This sum was the balance on deposit to the credit of the milling company when it was adjudged a bankrupt on December 17, 1932, if the attempt by the bank to credit the deposit on a note which it held be disregarded. The bank not only claimed the right to apply the balance on the note, but also denied the jurisdiction of the court to adjudicate the matter in a summary proceeding. The contention of the trustee in bankruptcy was that the balance represented funds accumulated for the benefit of creditors while the milling company's business was being operated by a creditors' committee and was not a deposit made by the bankrupt in the ordinary course of business; that the bank had full knowledge of the character of the funds, since its president was one of the creditors' committee; that the bank's claim of right to apply the funds on the note of the bankrupt was merely colorable and without substance; and that the court, for this reason, had jurisdiction summarily to direct the payment to the trustee of the balance of the deposit, which admittedly belonged to the trustee if the bank could not apply it on the note. Two questions are presented by the appeal: (1) Whether the bank had the right to apply the deposit balance on the note; and (2) whether the court had jurisdiction to adjudicate the matter in a summary proceeding.

On the first question, it appears that the funds constituting the deposit balance were unquestionably deposited while a committee of creditors was operating the business of the milling company, and that such deposits were not made in the ordinary course of business by the corporation, but under such circumstances as to constitute them a fund for the benefit of its creditors and to estop the bank from asserting against them any banker's lien or right of set-off. These circumstances were as follows: The milling company in the early part of the year 1932 was losing money and was in a bad way financially. In June, 1932, it placed its business in the hands of a committee representing three of its principal creditors to whom by far the larger part of its indebtedness was owing. This committee appointed a manager for the business and directed its operation. The policy adopted was to pay nothing on the larger debts outstanding and as little as possible on the others, and to use funds collected only for the operation of the business. About the middle of November the manager was instructed not to pay even the interest on the old debts, and to push collections. On November 29th it was decided that bankruptcy was inevitable, and the manager was directed to pay nothing except what was necessary to run the business and to put all collections in the bank. On November 30th the balance in bank on general account was only $671.21. From December 1st to December 15th the deposits were $3,780.17 and the withdrawals only $2,160.80. Applying to this situation the "first in first out" doctrine of Clayton's Case, 1 Mer. 572, Bryant v. Williams (D. C.) 16 F.(2d) 159, it is clear that the balance of $2,290.80 represented deposits made subsequent to December 1st. The remaining $400 was in a special deposit account, the purpose of which is not disclosed in the record, $200 thereof having been deposited on November 14th and $200 on November 21st.

The bank had full knowledge of the poli-

cy which was being pursued in handling the affairs of the milling company; and of the fact that deposits made in the name of the corporation were in reality made at the direction of the committee of creditors in pursuance of that policy; for its president, a Mr. Hall, was one of the members of the committee. The policy pursued by the committee was thus described by Mr. McClure, its chairman:

"After discussing the thing, and going over with the directors and Mr. Martin, the bookkeeper, the debts they had, we realized we could not pay them, and, the instructions were that they were not to pay any of the old indebtedness, for instance the Twentieth Street Bank and the First Huntington National Bank, and any of the other old big accounts, because we did not have the money to pay with, and if you paid one you simply took it from another, so we quit right there, although on some of the bigger accounts we gave a note, and paid a little interest on that, and some accounts of a few dollars paid them, and made little payments along, just stalling for time to see if the depression would not get over and business better and save the plant.

"It was my understanding of it, that that was the policy of all members of the committee. They elected me chairman, but I was governed, of course, by the balance of the committee's ideas, as well as my own, and there was never any disagreement between the three of us.

"Mr. Hall and Mr. Boone concurred in the policy just spoken of, the only policy we could use, and we would have been forced to that, because we could not pay these things and keep the mill running, because when a car of grain came in we had to pay for it before we got it off the track, and it got to the point where practically all stuff came in C. O. D.

"That policy was pursued from the time the committee took over the management of the Keister Milling Company until its bankruptcy; there was a little change after November 29th, 1932. Up to that time the policy was to pay as little as possible, and just enough that we could keep going, but after November 29th, 1932, there were absolute instructions not to pay anybody anything. * * *"

And regarding the period between November 29th and December 12th he testified: "In the interim, from November 29 until December 12, since we all felt in our own minds that bankruptcy was coming, Mr. Gilmore, the manager, was instructed not to pay any bills, except what he bought to run the mill with, for instance, gasoline, oil, and of course he had to pay freight, and might have to buy something locally so the mill could run, or maybe a little wheat. He was instructed to pay those bills, but not to pay any accounts that had existed at that time, or any interest on them, and to collect every cent of money he could and get it in the bank so that when we got ready to go into bankruptcy, we would have as much funds on hands as possible, and then let the Court decide where the money should go, rather than decide ourselves. As we said to him, and everybody agreed and understood, that any money paid when we knew we were going to have to quit would constitute a preference."

A meeting of the stockholders and directors of the milling company was held on December 12th with the creditors' committee, and it was decided to file a petition in bankruptcy. This petition was filed five days later, being delayed so as not to interfere in any way with a mortgage sale of the plant of the company which had been advertised. In the meantime, on December 15th, Mr. Hall, who as above stated was one of the committee of creditors and the president of the bank, directed that the bank credit the balance, which had been deposited in the name of the milling company under the direction of the creditors' committee, on one of the notes of the milling company which the bank held.

It is well settled that, in the absence of fraud and collusion or intent to effect a preferential payment, a bank may set off a deposit made in the ordinary course of business and subject to withdrawal by the depositor, even though the bank may know that the depositor is insolvent at the time. New York County Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199, 48 L. Ed. 380; Citizens' National Bank v. Lineberger (C. C. A. 4th) 45 F.(2d) 522, and cases there cited. But, in order that the bank may invoke this rule, the deposit must have been made by the depositor in the ordinary course of business. The right of set-off does not exist if the bank accepts the deposit knowing that it is made for a special purpose or is subject to a trust for the creditors of the depositor. Thus the right of set-off was denied in Merrimack Nat. Bank v. Bailey (C. C. A. 1st) 289 F. 468; Id. (D. C.) 283 F. 514, where the deposits were not made in the regular course of business by the corporation, but after a creditors' committee, on which the bank was represented, had taken over the business following an agreement of creditors for an extension of credit. Such

right was likewise denied in Union Bank & Trust Co. v. Loble (C. C. A. 9th) 20 F.(2d) 124; Petition of Union Bank & Trust Co. (D. C.) 14 F.(2d) 116, where the deposits were the proceeds of a sale to raise funds for Eastern creditors, and it was held that the circumstances under which the funds deposited were raised and the co-operation of the bank with the depositor so far impressed them with a trust as to estop the bank from asserting its right of set-off. A like result was reached by Judge Groner in Gates v. First Nat. Bank of Richmond (D. C.) 1 F.(2d) 820, where the deposits were made after the depositor had suspended business and its affairs were being investigated by a creditors' committee of which the vice president of the bank was a member. And this court in Union Trust Co. v. Peck (C. C. A. 4th) 16 F.(2d) 986, 987, denied the right of set-off where the deposits were made while creditors were conferring as to the adoption of a plan of reorganization. See, also, First Nat. Bank of Waco v. Sheehy (C. C. A. 5th) 29 F.(2d) 400; In re Davis (D. C.) 119 F. 950; and Wagner v. Citizens' Bank & Trust Co., 122 Tenn. 164, 122 S. W. 245, 28 L. R. A. (N. S.) 484, 135 Am. St. Rep. 869, 19 Ann. Cas. 483.

In the case at bar, the committee of creditors, of which the president of the bank was a member, had decided that no payments were to be made from the proceeds of its operation of the business on the larger debts of the milling company, which included the indebtedness due the bank, but that collections were to be used for the purpose of running the business and for the benefit of creditors generally. Later, when bankruptcy seemed inevitable, the committee directed that nothing be paid on indebtedness, but that collections be pressed and the money realized therefrom be deposited so that the court, and not the committee, might decide as to its application. Under such circumstances, the deposits made were clearly not deposits in the ordinary course of business by the milling company, and certainly the bank, after acquiescing in the plan of the committee, was estopped from claiming that it had the right to seize deposits made with it in the carrying out of this plan and apply them on debts of the bankrupt owing to itself. As said by Judge Rose in Union Trust Co. v. Peck, supra: "Most men would feel that it is an implied term of such negotiations that during their pendency nobody taking part in them shall do anything to secure preferential rights in or over any assets of the bankrupt which did not belong to it when the conferences began, or upon which it did not then have a prior lien."

As the bank had no excuse for not paying the amount of the deposits to the trustee in bankruptcy except the right asserted to apply them on its note, and as it so clearly had no right to apply them to this purpose, its claim to the deposits cannot be held to be in any proper sense adverse to the trustee. It was so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color of merit; and the court had jurisdiction in a summary proceeding to order that the amount of the deposits be paid to the trustee. In re Radley Steel Const. Co. (D. C.) 212 F. 462, 464; In re Davis (D. C.) 119 F. 950; In re Fuller (C. C. A. 2d) 294 F. 71. Of course, the bank became a debtor of the estate to the amount of the funds on deposit in the name of the bankrupt, and ordinarily a debt due the bankrupt must be collected by plenary suit; but, as said in the Radley Steel Const. Co. Case, supra, "the right to draw checks against the account (or to use the funds on deposit by order) distinguishes the possession of the bank from that of the ordinary debtor of a bankrupt estate, and gives the bankruptcy court the right to order payment to the receiver or trustee of such deposits as are not claimed by the bank upon some other ground than merely its holding as a depository." It is only where there is a substantial basis for an adverse claim, which is not merely colorable, that resort must be had to a plenary suit to recover such deposits. In re Fuller, supra, at page 73 of 294 F.; and see discussion in Lamb, Receiver, v. Townshend, Trustee (C. C. A. 4th) 71 F.(2d) 590 (this day decided).

The case is controlled in principle, we think, by the decision of the Supreme Court in May v. Henderson, 268 U. S. 111, 118 et seq., 45 S. Ct. 456, 69 L. Ed. 870. In that case assignees for creditors collusively allowed a bank to apply deposits on a note of the bankrupt; and it was held proper to require them in a summary proceeding to pay over the amount thus diverted from the estate. A fortiori the bank itself may be required in such a proceeding to turn over deposits belonging to the bankrupt estate, where it wrongfully withholds them from the trustee on the basis of a mere colorable claim.

For the reasons stated, the order appealed from was correct, and same will accordingly be affirmed.

Affirmed.