**JOSEPH F. HUGHES & CO. et al.**
**v. MACHEN.**

**No. 5659.**

Circuit Court of Appeals, Fourth Circuit.

Dec. 22, 1947.

Nathan Patz, of Baltimore, Md., for appellants.

Charles G. Page, of Baltimore, Md. (Frederick J. Singley, of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This is an appeal by two creditors of the bankrupt, Cummins Construction Corporation, from an order of the District Court ratifying a compromise agreement between the trustee in bankruptcy and several creditors of the bankrupt, including guarantors of obligations of the bankrupt.

The bankrupt was engaged in the construction business and during the war performed some work on Government projects. On October 16, 1944, it was indebted to the Baltimore National Bank on three notes in the sum of $70,000, and to the First National Bank of Baltimore on four demand notes in the sum of $125,000. All these notes were guaranteed by Albert S. Cummins, president of the bankrupt, John R. Cummins, vice president, Harold N. Cummins, secretary, and Charles A. Cummins, father of Albert and John Cummins and a stockholder in the bankrupt.

The bankrupt's solvency on October 16, 1944, depended upon the validity of certain claims which it had against the Government for work performed in the construction and installation of certain facilities at Cedar Point, Maryland. It had theretofore listed these claims as assets in its balance sheet, and without them was admittedly insolvent. On the morning of October 16, 1944, the bankrupt was informed that certain difficulties had arisen with respect to these claims and that payment could not be expected in the immediate future. Upon receipt of this information, Albert Cummins, president of the bankrupt, went to the Baltimore National Bank to secure additional funds. The facts were disclosed to an officer of the bank who referred Cummins to the First National Bank, indicating that the Baltimore National Bank would follow its lead. The First National Bank, upon being advised of the doubts surrounding the bankrupt's claims against the Government, called its notes and immediately took over its deposits in the sum of $53,886.29, and credited this amount against the notes. The Baltimore National Bank followed suit with respect to the bankrupt's deposit in the sum of $14,628.76, and applied it against a note of the bankrupt for $25,000 due that day.

Subsequently two other transactions took place which are relevant to the issues raised on this appeal. On December 8, 1944, the guarantors on the outstanding notes entered into an agreement with the banks, the substance of which was that Charles A. Cummins, one of the guarantors, and his wife were to pay to the banks the sum of $86,000, and, in consideration therefor, the banks agreed to release all the guarantors from any further liability on their guarantees. It was further provided that the banks would not reduce their claims against the bankrupt by this amount but that any money recovered by them over and above that to which they were entitled would be refunded to Charles A. Cummins and his wife. This was a proper arrangement for if the banks had reduced their claims by $86,000, this sum could have been claimed from the bankrupt by Charles A. Cummins.

The other transaction arises from a Government contract for construction work at Cedar Point, which in 1942 the bankrupt and Riggs Distler and Company, Inc., as joint venturers, agreed to perform. The Baltimore National Bank advanced funds to be used on this work by the joint venturers who, in return, executed an assign-

ment to the bank of any money due to them under the contract, and gave notice of the assignment to the Government. The assignment was limited so as to secure only advances made by the bank in connection with this project, and in 1944 all the advances had been repaid. The Government, however, had not been notified that the assignment had terminated, and accordingly, on December 6, 1944, the Bank received a check from the Government in the amount of $45,103.73 which represented a payment made under the Cedar Point contract. The bank cashed the check and delivered one-half of the proceeds to Riggs Distler and Company, Inc. but retained the balance, $22,551.86, and credited it against the bankrupt's obligations.

On January 4, 1945, the Company was adjudicated bankrupt upon an involuntary petition filed against it. The trustee in bankruptcy, upon a review of the facts above set out, concluded that the retention by the Baltimore National Bank of one-half of the Government payment was preferential and instituted proceedings to recover this sum. He was also of the opinion, however, that the set-off by the banks of the bankrupt's deposits against its notes were not preferential, either as to the banks or to the guarantors. Certain creditors, including the appellants, disagreed with this view and, with leave of court, brought suit against the guarantors to recover $68,515, the aggregate amount of the deposits. This suit has not yet reached a trial on the merits.

On August 2, 1945, the trustee entered into the compromise agreement with the two banks and the endorsers. The gist of the agreement is that the Baltimore National Bank will pay the trustee the sum of $22,551.86 retained by it from the Cedar Point project check, and, in consideration, both banks and all guarantors will be relieved of any further liability that might be asserted against them on behalf of the bankrupt estate. Twenty-two creditors including the appellants, were opposed to this plan, but the Referee recommended its acceptance. The District Judge modified the plan to provide for the payment of interest by the Baltimore National Bank on the money retained by it and, as modified, approved the compromise. This appeal followed.

The appellants object to confirmation of the plan on the ground that since there is at least a colorable claim against the guarantors which the creditors are willing to prosecute at their own expense, they should be allowed to proceed with their suit. Further, they say that there is no theory of law under which the Baltimore National Bank could be entitled to retain one-half of the Government payment and hence the surrender thereof cannot be considered as consideration for the release of the banks and the guarantors, and, under no hypothesis, as consideration for the release of the First National Bank or of the endorsers, who had no claim of any sort to the money.

The area of discussion will be much reduced if the position of the parties on certain questions, once at issue, but now in effect removed from the field of controversy, is first stated. The trustee in bankruptcy although inclined at first to the opinion that a reasonable argument, based largely upon the breadth of certain provisions in the collateral notes held by the Baltimore National Bank, could be set up in support of the Bank's claim to the proceeds of the Government check, is now satisfied that the claim cannot be sustained. Furthermore, it is not now disputed that on October 16, 1944, when the banks took over the deposits, both they and the endorsers had reasonable ground to believe that the Construction Company was insolvent.

On the other hand, the appellant creditors concede that the banks had the legal right, notwithstanding the company's insolvent condition on that day, to appropriate the deposits, and that by so doing, they did not receive a voidable preference under the bankruptcy statute. All of the testimony tends to prove that the deposits were made in the regular course of business and were not made fraudulently and collusively for the purpose of giving the bank an unlawful preference. During the hearings before the Referee the objecting creditors were pressed by the trustee to produce any evidence in their possession tending to show that the deposits were built up in an abnor-

mal way in order to give the banks an opportunity to credit them upon the notes and thus reduce the debts and the liability of the guarantors; but no such evidence was forthcoming. It was shown during the period prior to October 16, 1944, that the bankrupt deposited in an inactive account in another bank, to which the bankrupt was not indebted, the sum of $26,000. This action may have indicated some doubt on the part of the company as to its solvency, but it obviously had no tendency to show that the deposits in the active accounts were improperly increased. Nothing has been brought to our attention to cast any doubt upon the finding of the Referee, approved by the District Judge, that "the testimony definitely shows that the funds constituting these balances were deposited in due course of business, that no attempt had been made to build up these balances and no restriction had been placed on the withdrawal thereof. Neither is there anything in the evidence to show fraud or collusion between the banks and the bankrupt corporation, or between the banks and the guarantors of the notes."

It is of no practical importance that, strictly speaking, the question before us relates to the District Court's approval of the plan of compromise, or that as it now appears, no party to the plan gave up anything in the settlement but each received only that to which he was entitled. That indeed was the conclusion of the District Judge except that he required the Baltimore National Bank to pay interest on the money which it had wrongfully withheld from the trustee. If the decision was correct, it puts an end to the whole controversy and the creditors are not harmed, for they were accorded the same opportunity to offer evidence when the court had the compromise plan under consideration, as they would have had if they had been engaged in the trial of the suit which they brought against the guarantors.

The appellants' contention, reduced to its simplest terms, is that the endorsers of a company's notes, payable to a bank, receive a voidable preference under the Bankruptcy Act, if they cause the company to make deposits in its account in the bank, when they have reasonable grounds to believe that the company is insolvent, and the bank takes over the deposits within four months of the adjudication in bankruptcy, even though the deposits have been made in the usual course of business and not for the purpose of reducing the company's debt and the endorsers' liability therefor.

The relevant provisions of the Bankruptcy Act are Sections 60, subs. a, b, 1(30), and 68, sub. a, 11 U.S.C.A. §§ 96, subs. a, b, 1(30) and 108, sub. a. Section 60, sub. a provides that a preference is a transfer of any of the property of a debtor to or for the benefit of the creditor for or on account of an antecedent debt made or suffered by such debtor while insolvent and within four months of the filing of the petition, the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class. Section 60, sub. b provides that any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby has, at the time the transfer is made, reasonable cause to believe the debtor is insolvent. Section 1(30) provides that the word " 'Transfer' shall include the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise." Section 68, sub. a provides that in all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other and the balance only shall be allowed or paid.

The crucial phrase in these provisions, so far as the present controversy is concerned, is the phrase "transfer * * * of any of the property of the debtor" and particularly the term "transfer." It is firmly established that the act of a bank in taking over the deposit of a bankrupt and setting it off against his debt to the bank under Section 68 is not a transfer within the

meaning of the other sections referred to, provided the deposits were made in good faith and not as a cloak for a payment or other forbidden transaction. The matter was exhaustively considered by this court in Citizens' Nat. Bank of Gastonia, N.C. v. Lineberger, 4 Cir., 45 F.2d 522, 527, where the trustee in bankruptcy sought to recover from the bank the amount of the deposits which the bank had taken over with knowledge of the depositor's insolvency. Speaking for the court Judge Parker said: "An ordinary deposit in a bank, however, is not a 'transfer' within the meaning of this section. (Section 60, sub. a) * * * A deposit in a bank is not a sale or parting with property, or its possession, as a payment, pledge, mortage, gift, or security. It does not deplete the estate of the depositor, but results in substituting for currency, bank notes, checks, drafts, and other bankable items a corresponding credit with the bank, which may be checked against, and which provides the depositor with the medium of exchange in universal use in the transaction of business. A deposit of funds differs from a payment in the essential particular that it is withdrawable at the will of the depositor. Of course a deposit may be made the cloak for some other transaction such as payment or the giving of security; and in such case equity, which looks through form to substance, will treat the transaction according to its real nature. But if the deposit is in reality a deposit, made in good faith as such, subject to the withdrawal of the depositor, and not made as a cloak for a payment or other forbidden transaction it is not a transfer within the meaning of the Bankruptcy Act and cannot be attacked as preferential, even though it may have been made when the depositor was insolvent, and even though the bank, by applying it as a set-off, may have obtained a greater percentage on a debt which it holds against its insolvent depositor than his other creditors can obtain." See also Kane v. First National Bank, 5 Cir., 56 F.2d 534, 85 A.L.R. 362; Cusick v. Second National Bank, 73 App.D.C. 16, 115 F.2d 150.

■ This court has also decided that in such a case the endorsers of a note held by the bank do not receive a preferential transfer when, as the result of the bank's appropriation of the bankrupt's deposit, their secondary liability to the bank is wiped out or reduced. When the bank in such a case states its account with the bankrupt and sets off one debt against the other as provided by Section 68 of the Act, the obligation of the endorser is correspondingly reduced; and there is no substance in the suggestion of the appellants that Section 68 confers a right upon the bankrupt which the endorsers may not enjoy. The right of the endorsers in such a situation was considered by this court in Drugan v. Crabtree, 4 Cir., 299 F. 115, 119, 120, where it was said:

"* * * To hold an indorser on a note which had been extinguished by payment out of the maker's bank deposit liable under the circumstances here, in the absence of fraud, collusion, or other misconduct, would be going very far, and certainly ought not to be done, unless required by the plainest considerations of right and justice.

"To state the matter in brief, a bank, at or after the maturity of a note held by it, may charge it against the deposit account of its maker, and this as well when the bank knows the latter is insolvent as when it does not. If there is some one secondarily liable upon the note, as surety or indorser, its payment in full in this as in any other way releases him from any claim the bank might otherwise have upon him. Nevertheless the trustee in bankruptcy of the maker may have the right to require him to return the preference he has in effect received, if he in any way knowingly contributed to bringing about a state of things which enabled the bank to do what it did, as, for example, by procuring a deposit of the maker's funds in order that they might become subject to the bank's lien. Mechanics' & Metals National Bank v. Ernst, 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121; Wilson v. Citizens' Trust Co., D.C., 233 F. 697-700."

■ Of course the application of these principles presupposes that there has been a bona fide deposit made in due course of business. Thus where there has been a deliberate building up of an account for the

purpose of enabling the bank to obtain a preference, or where the deposit is accepted by the bank with the intent of applying it to the depositor's obligations rather than subjecting it to his power of withdrawal, an attempt on the part of the bank to set off the deposit will result in a preference as long as the other conditions of Section 60 are satisfied. Rector v. Commercial National Bank, 200 U.S. 420, 26 S.Ct. 294, 50 L.Ed. 533; Mechanics' & Metals National Bank v. Ernst, 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121; Goldstein v. Franklin Square National Bank, 2 Cir., 107 F.2d 393; Twentieth Street Bank v. Gilmore, 4 Cir. 71 F.2d 594; Callaway v. West Palm Beach Atlantic National Bank, 5 Cir., 69 F.2d 224, 225; Frankford Trust Co. v. Comber, 3 Cir., 68 F.2d 471; Rupp v. Commerce Guardian Trust & Savings Bank, 6 Cir., 32 F.2d 234. This result is reached because the apparent deposit is in fact a payment to the bank and the bankruptcy court will look through form to substance and treat the deposit as a transfer of property for or on account of an antecedent debt. Mechanics' & Metals National Bank v. Ernst, 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121; Frankford Trust Co. v. Comber, 3 Cir., 68 F.2d 471; Matters v. Manufacturers' Trust Co., 2 Cir., 54 F.2d 1010.

■ It is also true, as the appellants point out, that if a debtor makes a payment to a creditor within four months of the filing of the petition in bankruptcy, a preference results as to all sureties and guarantors on the obligation upon which payment has been made, since a surety or guarantor is a creditor within the meaning of Section 60, and a payment to the obligee is a transfer which benefits sureties or guarantors. Paper v. Stern, 8 Cir., 198 F. 642; Cohen v. Goldman, 1 Cir., 250 F. 599; Collier on Bankruptcy, 14 Ed., Sec. 60.17; 2 Glenn, Fraudulent Conveyances and Preferences, 1940, Sections 460 to 462. Under Section 60, sub. b, the trustee may avoid such a preference if the creditor to be benefited had reasonable cause to believe the debtor insolvent. This rule, however, does not avail the appellants in the pending case because the deposits made in the two banks, as we have seen, were not payments or transfers for or on account of an antecedent debt.

■ The appellants make the additional contention that even if the principles outlined above were applicable prior to the passage of the Act amending the Bankruptcy Act in 1938, they no longer control because the definition of the term "transfer" was greatly broadened by the change in Section 1(30) of the statute so as to include any disposition of or parting with property or an interest therein either direct or indirect. An examination of the legislative history, however, disposes of this argument. While the question has not been considered in any case that has come to our attention, it has been discussed by textwriters who point out that when the amendment was in its preliminary stages, amendments to the set-off provision in Section 68 of the Act were proposed which would have altered the recognized rule; and that although these amendments received considerable support, they were rejected by Congress; and hence it is clear that although the term "transfer" has a wider significance as used in Section 60 than formerly, Congress had no intention of altering the accepted law as to bank deposits. See 3 Collier on Bankruptcy, 14th Ed., § 60.16, p. 805; 4 Collier on Bankruptcy, 14th Ed., § 68.01, p. 705; 2 Glenn on Fraudulent Conveyances and Preferences, 1940, § 407.

Affirmed.