## BANK OF CALIFORNIA v. BRAINARD.

### In re SIMON BROS.

(Circuit Court of Appeals, Ninth Circuit.
January 5, 1925. Rehearing Denied
January 26, 1925.)

### No. 4294.

Bankruptcy ⬤⟲303(3)—Evidence held to sustain finding that deposit was not in usual course, but intended to pay bankrupt's indebtedness to bank, constituting voidable preference.

Evidence *held* to sustain finding that checks deposited by bankrupt were not deposit in usual course of business, but intended to pay bankrupt's notes to bank under circumstances showing bankrupt's knowledge of insolvency, and constituted voidable preference.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; George M. Bourquin, Judge.

Action by G. W. Brainard, as trustee in bankruptcy of Simon Bros., a copartnership composed of Bert Simon and another, doing business under the name of Simon Bros., and also under the name of the Hercules Cement Products Company, against the Bank of California. Judgment for plaintiff, and defendant brings error. Affirmed.

Pillsbury, Madison & Sutro, and Frank D. Madison, all of San Francisco, Cal., for the plaintiff in error.

Norman A. Eisner and Joseph Kirk, both of San Francisco, Cal., for the defendant in error.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

GILBERT, Circuit Judge. The defendant in error as trustee in bankruptcy of Simon Bros., a partnership consisting of Bert Simon and Sam Simon, recovered a judgment against the plaintiff in error for $12,381.41 as a preference payment received from the assets of the bankrupts within four months prior to the filing of the petition in bankruptcy. The only question before this court is whether the trial court erred in denying the motion of the plaintiff in error for a directed verdict in its favor. It is contended that the motion should have been allowed on the ground that the deposit of checks with the bank whereby the payment was made was made in the ordinary course of business and was subject to set-off, and that there was no evidence that the bank knew of the insolvent condition of the bankrupts, or that it had reasonable cause to believe that the effect of the payment would be to enable it to obtain a preference voidable under the provisions of the Bankruptcy Act.

Examining the record, as we must to ascertain, not whether the verdict was against the weight of the testimony, but whether there was any testimony at all which, if credited by the jury, was sufficient to sustain a verdict for the trustee, we find evidence of the following facts:

The bankrupts had been doing business with the bank since April, 1919. On September 24 of that year they owed the bank for borrowed money $45,000. During the year 1921 the bankrupts lost heavily in their business. In November of that year the bank expressed its dissatisfaction with the way in which the bankrupts were doing business, and from that time there was constant reduction of the debt and of loans by the bank. In 1922 there were many conferences between the bankrupts and the bank pertaining to the financial condition of the bankrupts' business, and reductions of the indebtedness to the bank were made at the latter's request. In the meanwhile, the bankrupts' business was in a failing condition. On January 1, 1922, their books showed an inventory of $296,124. On January 1, 1923, they showed $71,494. On February 28 of that year they showed $5,494. March 5, 1923, was the date of the alleged voidable preference. The bankrupts had just received $12,000, the final payment of the purchase price of real estate which they had sold. At that time the bankrupts' balance in the bank was $5.74. Sam Simon and one Marymont, the purchaser of the property, entered the bank and at the deposit window deposited four checks, two on other San Francisco banks, one on an Oakland bank, and one on a San Luis Obispo bank, amounting in the aggregate to $12,170.60. They then went to the note window, presented checks for the principal and interest of the notes, and asked for the surrender of the bankrupts' notes to the bank, on which there was due and unpaid $12,381.40. There were present at that window three note clerks of the bank, Redmond, Lyons, and Carmany. Redmond consulted Lyons concerning the surrender of the notes. Lyons answered that he would not take the responsibility, and told Redmond to consult Mr. Pentz, who was the vice president and cashier.

The question was whether the checks should be taken in payment of the notes. Lyons testified that Marymont appeared to be excited and said, "You take it; you take it; don't say anything, but take it;" and

that, when he went to consult Mr. Pentz, Marymont went with him and said something to Mr. Pentz, which he (Lyons) did not hear, and that Mr. Pentz thereupon told him to accept the checks and surrender the notes. Redmond testified that Simon came in with Marymont and presented a check for the payment of the principal of the notes, and later a check for the interest, and that Marymont seemed impatient for the delivery of the notes. "I explained that I would give them to him in a few seconds; something to that effect. I sent one of the boys around to look up the balance of the account, and he was gone some time. This gentleman got a little more impatient, and he said, 'I want the notes; I want the notes; you do what I tell you.' And in the meantime this party came back that looked up the balance, and reported that there was a credit sufficient to pay for the balance of the notes, and he also reported that there was a check on Oakland for $6,000, and under the conditions I could not surrender the notes, because the deposit was made up of uncollected checks; so I referred him to Mr. Lyons, the head of the department, and he went to Mr. Pentz. Q. Do you remember this gentlemen telling you—the gentleman who was with Redmond—to take the checks and say nothing about it? A. I do not remember that last part of it, 'say nothing about it.' He said, 'Take it, take it.'"

It was further shown that the checks so presented were not sufficient in amount to meet the principal and interest on the notes, and that the deficiency was $205.

The evidence does not justify the conclusion as a matter of law that the deposit of the checks was a bank deposit in the usual course of business. There was evidence to indicate that the bank itself did not so regard it, and that uncollected checks were not considered as cash on which a note of the bank might be surrendered. The bankrupts' business had ceased in December, 1922. Bert Simon had left the firm and had gone to work elsewhere. The firm was making no substantial deposits with the bank. None was made in the month of March, 1923, prior to March 5. The deposit of checks on that date was obviously made for the purpose of paying the bankrupts' notes to the bank. It was in effect a transfer of the checks for that purpose. It was parting with so much of the bankrupts' assets to pay one of their debts, and it operated to diminish by that much the bankrupts' estate. The circumstances under which the deposit was made, the actions of one of the bankrupts, and the words of the man who accompanied him were sufficient to inform the officers of the bank that the transaction was out of the usual course of business.

We find nothing in the cases cited by the plaintiff in error, such as Studley v. Boylston National Bank, 229 U. S. 523, 33 S. Ct. 806, 57 L. Ed. 1313, to sustain its contention that the right of set-off exists under the facts presented in the present case. Those cases go no farther than to hold that the Bankruptcy Law recognizes the right of set-off of mutual accounts between a bank and a depositor, and does not deprive the bank of the rights of any other creditor taking money without reasonable cause to believe that a preference will result. But here there were no mutual accounts. There was but a payment of a note to the bank, under circumstances which, if the bank had knowledge of the bankrupts' insolvency, made the payment preferential. Traders' Bank v. Campbell, 14 Wall. 87, 97, 20 L. Ed. 832; In re National Lumber Co., 212 F. 928, 129 C. C. A. 448; In re Fairburn Oil & Fertilizer Co. (D. C.) 240 F. 835; First Nat. Bank v. Harper, 254 F. 641, 166 C. C. A. 139; Merrimack Nat. Bank v. Bailey (C. C. A.) 289 F. 468.

The evidence that the bank knew on March 5, 1923, that the bankrupts were insolvent is circumstantial and somewhat meager. There is testimony that in 1922 there were frequent conferences between the bank and the bankrupts concerning the latter's financial condition. But at that time the bankrupts were not insolvent. There is no evidence that they were insolvent prior to June, 1922. On December 31, 1922, their books showed a deficit of $58,000. By February 28, 1923, their assets had shrunk to $5,494, consisting of fixtures and broken parts of stock. At that time the bankrupts owed about $82,000 to about 100 creditors.

The trial court, in charging the jury, said: "A creditor has reasonable cause to believe a debtor insolvent when such a state of facts is brought to the creditor's notice respecting the affairs and pecuniary condition of the debtor as will lead a prudent business person—a prudent banker in this case—to conclude that the debtor is insolvent. * * * And when you come to ask what a reasonably prudent and intelligent person ought to have known under the circumstances, you take into consideration an average prudent banker. They have special training, special knowledge, and perhaps would have a little more understanding of the inferences to be drawn from the circumstances of debtors than a mere ordinary

layman, who has no knowledge of the business of banking." No exception was taken to the instruction.

The evidence that the bank had actual notice of facts from which insolvency was inferable consists in what was said and done at the bank on March 5, 1923. One of the bankrupts deposited with the bank four checks drawn on other banks, the total amount of which, together with the $5.74, the balance then on deposit to the credit of the bankrupts, was insufficient by $205 to meet the payment of the notes and interest. He then presented at the note window a check already drawn for the payment of the principal of the notes, and, on learning the amount of the interest due, drew and presented a second check for that amount. The bank had no knowledge that the checks which were thus deposited with it were collectable. It took no steps to ascertain whether they were good, or would ever be paid. To regard such a deposit as a cash deposit, and on the strength thereof to surrender its notes, was out of the usual course of the bank's business.

The evidence of what occurred was sufficient to justify the jury in believing that the bank's action in so doing without further inquiry was the direct result of the earnest insistence of the man who accompanied the bankrupt, and who had been the maker or the payee of the checks so deposited, when in an excited manner and with a gesture he said to the clerks, "You take it; you take it; don't say anything, but take it." We cannot say as a conclusion of law that the jury were not justified in believing that the words and manner of the speaker meant that the bankrupts were insolvent, and that the bank's only chance to get payment of its notes was to accept the checks at their face value and apply the same in payment, and that under the circumstances bank officers of ordinary prudence could not have failed to have reasonable cause to believe that the payment so received by the bank was a preference.

The judgment is affirmed.