## BLUE v. HERKIMER NAT. BANK.

### In re TRYON.

Circuit Court of Appeals, Second Circuit.
January 7, 1929.

No. 96.

Willis, Doolittle & Guile, of Utica, N. Y. (Woodward W. Guile, of Utica, N. Y., of counsel), for plaintiff.

Snyder, Cristman & Snyder, of Herkimer, N. Y. (Charles E. Snyder, of Herkimer, N. Y., of counsel), for defendant.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. Both parties appeal from a decree setting aside a transfer of personal property by a bill of sale and an assignment of moneys made to the defendant. The bill of sale was from the bankrupt to the defendant, dated September 1, 1917, and conveyed the bankrupt's contracting plant and machinery. The assignment of moneys was executed August 21, 1917, and transferred moneys due from the state of New York and the county of Madison for building highways in the northern part of New York. The bill of sale, as found below, was intended to be given as security, and was held void under section 230 of the Lien Law of the state of New York (Consol. Laws, c. 38).

Tryon had the contract to build two sections of state highway, and while engaged in that work was adjudicated a bankrupt, February 4, 1918. From July 3, 1916, he deposited his moneys with the defendant and borrowed some for carrying out his contracts. He gave a financial statement, which seemed satisfactory to the bank until he owed $21,000 to it on August 21, 1917, when he executed and delivered assignments of all the moneys due and to become due from the state and the county for the work performed on the contracts. The bill of sale of all his road machinery names a money consideration of $1,000. It was then valued at $20,000. Since this was given as security only, it is properly held below that, while it in form was a bill of sale, in fact and in law it was a chattel mortgage. When given, the bankrupt's only other property was an equity in real estate in Connecticut, worth, unincumbered, $4,500. He owed all creditors at this time $43,850, which obligations were known to the bank. After these assignments, and delivery of the bill of sale, the bankrupt continued to use the plant and machinery, and continued to carry on in the fulfillment of his contracts. All the moneys received from the state were deposited by the bank in the bankrupt's general banking account with the defendant. These amounted to $12,171.91. The moneys so deposited were checked out by the bankrupt without further accountability to any one.

On January 15, 1918, 20 days before bankruptcy, the defendant opened a special account in defendant's bank, called "Robert Earl Special Account." All road moneys received after the date of opening this account, $12,312.64, were placed in it by the bank. On January 14, 1918, 21 days before bankruptcy, certain of the bankrupt's horses and harness, scheduled in the bill of sale, were

sold, and the proceeds placed in the "Robert Earl Special Account" the next day. After adjudication in bankruptcy, February 4, 1918, the defendant assumed possession and control of the balance of the bankrupt's equipment and machinery, and the trustee made application to the referee for leave to commence suit to set aside the bill of sale and the assignment. On the return of the order to show cause, granted by the referee, an order was entered for the prompt disposition of this personal property and that the funds so obtained be held to await the result of the suit. The defendant, however, repaired and painted the machinery and rented out parts of it, and sold some at private sale, and the balance was sold nine months later, after notice and subject to the conditional contract of sale as to some of the chattels of the Acme Road Machinery Company on which there remained unpaid $6,114.05, with interest. The sum of $6,375 was realized at this sale and placed by the bank in the "Robert Earl Special Account." Other road machinery and equipment of the bankrupt brought $6,504.53, which was also placed in the same account. Rentals of the machinery received, amounting to $4,222.66, were placed in this account. The defendant had disbursements necessary in repairing the machinery for rental, amounting to $2,686.86. The total receipts from January 15, 1918, to February 5, 1919, amounted to $14,415.33.

On February 4, 1918, the defendant held notes of the bankrupt in the sum of $22,650, of which $9,550 were replaced with notes signed solely by the bankrupt's wife. Both the notes signed by the bankrupt and the replacement notes signed by his wife, upon which there was no indorser, were paid out of the "Robert Earl Special Account," at least in part, the correct amount not satisfactorily appearing, together with interest. The expenses in connection with the filing of the petition and schedules in bankruptcy, and an overdraft in his general account for $503.73 on January 20th, was paid out of this account. Counsel fees for services of the attorney who filed the petition in the bankruptcy proceedings were also paid. The total amount received by the defendant and placed in this special account up to May 15, 1920, was $30,855.99. After the adjudication in bankruptcy, $21,251.34 was paid by the defendant from this account to itself. The balance of the moneys of this account, exclusive of the sums paid to the bank's attorney, the making good of the bankrupt's overdraft, the payment of expenses in connection with the bankruptcy proceedings, was applied to the expenses of continuing the road contracts. On April 1, 1920, there was a balance in this special account of $1,523.36.

The schedules filed in the bankruptcy show liabilities of $42,069.05 and assets of $7,821.75, but the trustee realized only $954.36. The defendant was not listed as a creditor in these schedules, although it is proven that its officers examined the petitioner, and although it claimed an indebtedness of $22,650, and it never presented a claim against the bankrupt's estate. During the period beginning August 21, 1917, and until the date of bankruptcy, the bankrupt owed large sums to other creditors. The District Court entered a decree for the plaintiff, allowing a recovery for $20,460.58, with interest from December 1, 1925, made up of the amounts received at public and private sale of the personal property, with interest, the amounts received for rental of the machinery, less disbursements, with interest.

The bill of sale was concededly given as security to the defendant for its loans and must be regarded as a chattel mortgage. Stevens v. Meriden Britannia Co., 160 N. Y. 178, 54 N. E. 781, 73 Am. St. Rep. 678; Dickinson v. Oliver, 195 N. Y. 238, 88 N. E. 44; Keller v. Paine, 107 N. Y. 83, 13 N. E. 635. It was therefore necessary to the validity of such mortgage that it be accompanied by immediate delivery, and followed by an actual and continued possession of the things mortgaged, or filed as required by the state statute (Lien Law N. Y. § 230); if not, "it is just what it would have been at common law, viz., per se, a fraud upon the creditors of the mortgagor." In re Rambler Cafeteria (C. C. A.) 9 F. (2d) 861. And it is void as against the trustee in bankruptcy. Bankruptcy Act, §§ 47(2), 67a and 70e (11 USCA §§ 75(2), 107(a), 110(e); Knapp v. Milwaukee Trust Co., 216 U. S. 545, 30 S. Ct. 412, 54 L. Ed. 670; In re Schmidt (C. C. A.) 181 F. 73; Skilton v. Codington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885.

It is immaterial whether the bankrupt resided in the village of Poland, N. Y., or at Meridan, Conn. The bill of sale would be equally void for nonfiling, assuming residence in Meridan, for the reason that the property mentioned in the bill of sale was located in New York on September 1, 1917, and, in the case of a nonresident, filing must be in the city or town where the mortgaged property is located at the time of the execution of the mortgage. Lien Law New York, § 232. The bankrupt had equities in some of the chattels which were subject to the conditional bill of sale, and this might have been

mortgaged. United States v. New Orleans R. R., 12 Wall. 362, 20 L. Ed. 434; Washington Trust Co. v. Morse Iron Works & Dry Dock Co., 106 App. Div. 195, 94 N. Y. S. 495; Auto Mortgage Co., Inc., v. Montigny (Sup.) 168 N. Y. S. 670; Chase v. Ingalls, 122 Mass. 381. But the mortgage is ineffective as to these chattels, as well as the others enumerated in the schedule.

■ All the chattels thus attempted to be mortgaged were sold at a private sale and at auction, and brought a total of $12,879.53. Some were rented after the bankruptcy, for which there was received $4,222.66. However, the defendant spent, in care and maintenance and for repairs to machinery, $2,686.86, for which it should receive credit, which leaves a balance of $14,415.33. In the month of January, 1918, there were sold by the defendant horses, mules, and harness, and again, one year later, it sold mules; the total amount from the two sales being $2,156.19, which must be accounted for. The trustee should therefore have a recovery for these proceeds after giving the credits referred to, including the notes of the Acme Machinery Company, leaving a balance due as the result of the sale and rental of the bankrupt's personal property, amounting to $16,571.52, to which interest will be added.

■■ After the assignment of the road moneys was made to it as collateral security for payment of the bankrupt's debt, the bankrupt was permitted to use the moneys as he collected them without accountability up to January 15, 1918; the moneys were deposited in the bankrupt's general account. These moneys, thus deposited, were checked out without restrictions. Prior to January 15, 1918, the moneys were deposited in, and some withdrawn from, the general account, and used by the bankrupt and his wife. This free and unrestricted use of the moneys so assigned destroyed any lien created. An agreement, either oral or written, which permits the debtor to use the money assigned, avoids the lien intended, and makes the assignment void. Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 991; In re Leslie-Judge Co. (C. C. A.) 272 F. 886.

■ The majority think that the course of conduct of the parties here fairly permits us to imply that there was an agreement by which the bankrupt was to continue the work and finish his contract, and the bank was to supply the necessary money, if collected, from the assigned accounts. Moneys retained by the defendant after the date of bankruptcy belonged to the trustee. Before February 5, 1919, there was collected and deposited $12,312.64 in the "Robert Earl Special Account." Such items as were charged against it for repayment of loans or interest thereon may not be allowed as an offset. The debts were not mutual. Prior to January 15, 1918, and after the assignment, the bank collected and deposited in the bankrupt's account $12,171.91 of road moneys, and deposited this in his general account. Payment thereof to him discharged the bank as to this amount. Between October 4th and February 4th, the bank received payment of some of its loans, but the record is not clear as to the amount thereof. From the record, it is impossible to determine the payments made by the bank in carrying on the contract. The "Robert Earl Special Account" gives a list of disbursements on and after January 15, 1918, but gives no indication of how many of these items were payments which directly helped to carry on the road contracts. There is no testimony of witnesses as to this.

■ From the opinion below, however, it appears that the bank claimed that the total amount received prior to the opening of the "Robert Earl Special Account" was applied by the bank to enable the bankrupt to complete the road contracts. It makes the same claim with regard to the amount of the road contracts placed in the special account. The court below, in its opinion, does not appear to have disagreed with this claim, but merely found that there was no lien to this amount. As to the moneys collected and deposited after February 4th, when the bankruptcy ensued, the bank is liable therefor to the trustee. Between October 4, 1917, and February 4, 1918, the bank received payment of some of its loans maturing within that period, which, together with interest, appears to be $30,505.53. The last of the bankrupt's charges paid out of the general account created an overdraft of $425.55, which increased until, on February 1, 1918, it amounted to $503.73, and on that day was made good by the defendant out of the "Robert Earl Special Account," and this sum must be paid to the trustee. The payment of the bank's notes from money realized on the assignment of the road contracts constituted a voidable preference.

It is obvious that the moneys thus collected were used for the purpose of creating a fund to be applied upon the maturing note obligations of the bankrupt during the four months period, and this was a voidable preference, if the defendant had knowledge of the bankrupt's insolvency. Mechanics & Metals Nat. Bank v. Ernst, 231 U. S. 60, 34 S. Ct. 22, 58 L. Ed. 121, In re Starkweather & Al-

bert ·(D. C.) 206 F. 797. It had full knowledge of the bankrupt's financial condition from the statement furnished, and from its method of handling his moneys when received in payment of the contract it displayed a desire to protect itself. To a considerable extent, the defendant took supervision of his finances in carrying out his contracts. It had reasonable cause to believe that it was obtaining an advantage over other creditors, and is chargeable with the intent of creating a preference for itself. Alexander v. Redmond (C. C. A.) 180 F. 92; Gray v. Breslof (D. C.) 273 F. 526. Of this $12,312.64 received by the defendant after January 15, 1918, in the "Robert Earl Special Account," and which was not paid to the bankrupt, the defendant is responsible to the trustee.

Because we are unable to accurately tell from this record the amounts paid the bank out of the bankrupt's funds between October 4, 1917, and February 4, 1918, and thereafter, we must reverse the decree, and direct the court below to ascertain this amount and add it to the sums the plaintiff will otherwise recover. The decree then to be entered will be for $16,571.52, plus the overdraft paid of $503.73; also moneys received from the state and county after February 4, 1918, which were then due as retained percentage or otherwise to the bankrupt, giving the bank credit for moneys spent for completion of the contract; also moneys paid on the bankrupt's notes, except renewals, during the four months period and thereafter, together with the fees and disbursements paid to the attorney filing the petition in bankruptcy. Interest will be added to these several sums. To the extent that Tryon remains indebted to the bank, it shall have a right to file its claim as a general creditor.

The record on this appeal has been prepared with an utter disregard for the equity rule of this court requiring the reduction to narrative form. The record of 1367 pages could and should have been greatly reduced. The briefs submitted by the plaintiff in this ordinary suit consist of 309 pages. Both are violative of the letter and spirit of our rules and unduly burden the court. Because of the uncalled-for and certainly undesirable delay in this case, we have studied both the briefs and record, rather than require that both be again prepared with due regard for the rules and practice prevailing at the bar of this court. This suit was commenced May 3, 1919. The trial was commenced November 22, 1920, and, with intermissions, concluded January 15, 1921, and a final opinion was rendered December 10, 1925. The decision and judgment was entered February 9, 1926. Between the date of the conclusion of the trial and the rendition of the final opinion, there was a rehearing, and a reargument had on January 21, 1922, and further evidence was heard on December 8, 1923. Of all classes of cases pending in the courts, bankruptcy proceedings are the last which should be delayed. To do so is a great injustice to creditors. Such delays foster just criticism and bring disrespect for the administration of justice.

The decree will be reversed, and a decree entered in accordance with this opinion.