Donald **KATZ**, Trustee in Bankruptcy of Oakland Foundry Company of Belleville, Illinois, Inc., Plaintiff-Appellant,

v.

The **FIRST NATIONAL BANK OF GLEN HEAD**, Defendant-Appellee.

No. 982, Docket 76–7577.

United States Court of Appeals, Second Circuit.

Argued May 2, 1977.

Decided Oct. 17, 1977.

Certiorari Denied Feb. 21, 1978.

See 98 S.Ct. 1250.

---

966

David J. Letvin, East St. Louis, Ill. (Joel
A. Kunin, and Cohn, Carr, Korein, Kunin &
Brennan, East St. Louis, Ill.; Murray S.
Lubitz, and Kazlow & Kazlow, Scarsdale,
N. Y., on the brief), for plaintiff-appellant.

Michael L. Cook, New York City (William
M. Goldman, Lenard H. Gorman, and Weil,
Gotshal & Manges, New York City; Gold-
man, Horowitz & Cherno, Mineola, N. Y., on
the brief), for defendant-appellee.

Before TIMBERS and VAN GRAAFEI-
LAND, Circuit Judges, and OWEN, District
Judge.*

* Hon. Richard Owen, United States District Judge, Southern District of New York, sitting
by designation.

TIMBERS, Circuit Judge:

Donald Katz, trustee in bankruptcy of the Oakland Foundry Company of Belleville, Illinois, Inc. (Oakland), sued The First National Bank of Glen Head (the Bank) in the Eastern District of New York to recover $108,732.07 which the trustee alleged constituted a voidable preference under § 60 of the Bankruptcy Act, 11 U.S.C. § 96 (1970).[1] The district court, George C. Pratt, *District Judge*, in an opinion filed October 19, 1976 granted the bank's motion for summary judgment and dismissed the trustee's complaint. From the judgment entered accordingly on October 22, 1976, the trustee has appealed.

The district court, in granting the bank's motion for summary judgment, assumed for purposes of the motion that the depositor in fact was insolvent at the time of the deposits and later set-offs, and that the bank had reasonable cause to believe it to be insolvent. Thus the narrow holding of the court below was that, since the bank had obtained the funds of the bankrupt by setting off money on deposit with the bank in the bankrupt's checking account, in conformity with § 68(a), 11 U.S.C. § 108(a),[2] there was no "transfer" and, absent a transfer, no preference that could be avoided by the trustee.

■ We reverse and remand for trial in order to resolve certain issues of fact which

we shall discuss more fully below. In reversing and remanding we are mindful of the traditional rule that in order to prove a voidable preference the trustee must show complicity or understanding on the part of the bank. This is in accordance with a long line of authority that a bank is entitled to set off deposits which were accepted in good faith and in the regular course of the bank's business. This rule in turn is premised on practical commercial considerations; it has survived the test of time; and, absent compelling reasons for doing so, it should not be disturbed. Within this framework, we hold that the district court misinterpreted the law and erroneously applied its interpretation to the allegations of the complaint, thus foreclosing a jury's resolution of such critical issues of fact as whether, in view of the build-up and real nature of the Glen Head account, the bank acted in good faith in accepting the deposits or whether the account in fact was a general deposit account. To resolve these and other issues of fact we reverse and remand.

## I.

The course of events which lead to the bank's exercise of its asserted right of set-off began on January 16, 1969 when the bank made a $125,000 loan to Oakland. This loan was obtained for Oakland by its

---

1. Throughout this opinion all statutory citations, unless otherwise stated, are to sections of the Bankruptcy Act, Title 11 of the United States Code, 1970 revision.

   For example, here § 60(a)(1), 11 U.S.C. § 96(a)(1), provides:

   "A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor *while insolvent and within four* months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

   The term "transfer" is defined in relevant part in § 1(30), 11 U.S.C. § 1(30), as follows:

   " 'Transfer' shall include the sale and every other and different mode, direct or indirect, of disposing of or parting with property or with an interest therein or with the posses-

sion thereof . . ., absolutely or conditionally, voluntarily or involuntarily, . . . as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security or otherwise."

§ 60(b), 11 U.S.C. § 96(b), authorizes a trustee in bankruptcy to avoid a preference "if the creditor receiving it or to be benefited thereby . . . has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."

2. § 68(a), 11 U.S.C. § 108(a), provides:

   "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

   The Supreme Court has approved a bank's right of set-off in *Studley v. Boylston National Bank*, 229 U.S. 523 (1913), and in *New York County Bank v. Massey*, 192 U.S. 138 (1904).

president and chief executive officer, Herman Brede. Oakland was a wholly-owned subsidiary of Electronic Cabinets, Inc., all of whose stock was owned by Brede and his wife. Oakland's indebtedness to the bank was guaranteed personally by the Bredes, as required by the bank, and was secured by a pledge of all the Bredes' stock in Electronic Cabinets, Inc. and all of their stock in another company wholly owned by the Bredes. When Oakland's indebtedness to the bank later was converted to a demand note in June 1970, the Bredes gave the bank additional security in the form of a second mortgage on their home. Pursuant to the bank's usual practice, Oakland opened a general checking account with the bank when the loan was first made.

Oakland had been having financial difficulties even before it obtained the loan from the bank. Its financial condition deteriorated until it virtually ceased doing business in March 1971. By June 1971 Oakland had either ceased making or reduced significantly office and factory payroll.

In the district court proceedings the trustee sought to show that Oakland's deposits in its Glen Head account constituted preferences by comparing the activity in that checking account with the activity in Oakland's checking accounts in an Illinois bank. The trustee also sought to prove that practically all of Oakland's banking activity was carried on through two accounts in the Illinois bank, while the Glen Head account remained substantially inactive from July 1970 until March 1971. During this period Oakland made only a few deposits in and withdrawals from the Glen Head account and the balance never rose above $5,800. Beginning April 20, 1971 this pattern changed markedly. From April 20 to June 30 Oakland built up the balance in its Glen Head account from $865.09 to over $100,000. During this period no withdrawals were made. The first reduction in the balance occurred on June 30 when the bank set off the sum of $108,783.91 against the $125,000 which Oakland owed on the loan.

The trustee also sought to prove that Anthony D. Famighetti, the bank's president and the officer primarily concerned with the Oakland loan, was aware of Oakland's worsening financial condition and that he was aware that the Glen Head account was being built up in anticipation of Oakland's impending bankruptcy, thus to be available for a set-off by the bank. On June 29, 1971 Brede called Famighetti to apprise him of Oakland's difficulties. Brede told Famighetti that he would try to work something out with Oakland's creditors. Famighetti immediately placed a freeze on Oakland's account. On June 30 the bank executed the set-off and applied it against the outstanding $125,000 loan. On July 15 an involuntary petition in bankruptcy was filed in the Eastern District of Illinois against Oakland which was adjudicated a bankrupt on August 18.

For purposes of the bank's motion for summary judgment the district court correctly accepted as undisputed the essential facts summarized above to the extent that they were asserted by the bank in support of its motion and admitted by the trustee in his answering papers. On the basis of the undisputed facts the court concluded that Oakland's Glen Head deposits were not made in the regular course of Oakland's business. The court nevertheless dismissed the complaint on the ground that "[t]he test [for determining whether a 'deposit' really is a 'transfer'] is not whether the deposits were made in the depositor's regular course of business, but instead, whether they were accepted by the bank in its regular course of business."

We hold that the legal standard articulated by the district court was erroneous. We further hold that, whether under the standard articulated by the district court or under the correct standard, the bank's motion for summary judgment should have been denied because there remained triable issues of fact, including whether the bank was aware of Oakland's intentional build-up of its account as reflected in the bank's acceptance of the deposits other than in the bank's regular course of business.

## II.

■ Section 60(a) defines a preference in terms of six key elements.[3] Only one is of concern here. The district court assumed that elements (2)–(6) of § 60(a) were present. We likewise assume that the trustee, if afforded the opportunity at trial, could prove elements (2)–(6) in Oakland's series of deposits in its Glen Head account. The only remaining issue is the requirement of element (1) that there be a "transfer"[4] of the debtor's property.[5]

The district court concluded that there had been no transfer because Oakland deposited its funds in an ordinary checking account from which it could make withdrawals, until the bank imposed the freeze on June 29, 1971. In view of this factor, and because the court concluded that the trustee could not prove any agreement or complicity between Oakland (Brede) and the bank with regard to building up the account, the court concluded that the relationship between Oakland and the bank did not differ from an ordinary debtor-creditor relationship. This was the predicate for its conclusion that Oakland's deposits were not transfers within the meaning of § 60.[6]

■ It is well settled that deposits in an unrestricted checking account, made in the regular course of business, do not constitute transfers within the meaning of the Bankruptcy Act. *New York County Bank v. Massey,* 192 U.S. 138, 145 (1904); *Jensen v. State Bank of Allison,* 518 F.2d 1, 4 (8 Cir. 1975); *Farmers Bank v. Julian,* 383 F.2d 314, 324 (8 Cir.), *cert. denied,* 389 U.S. 1021 (1967); *Joseph F. Hughes & Co. v. Machen,* 164 F.2d 983 (4 Cir. 1947), *cert. denied,* 333 U.S. 881 (1948); *Cusick v. Second National Bank,* 115 F.2d 150, 151–52 (D.C.Cir.1940); *Frankford Trust Co. v. Comber,* 68 F.2d 471, 472 (3 Cir. 1933); *Citizens' National Bank of Gastonia v. Lineberger,* 45 F.2d 522, 526–27 (4 Cir. 1930). The theory of these cases is that a deposit creates a debt owed to the depositor by the bank and does not constitute a parting with property by the depositor. As the court said in *Lineberger, supra,* 45 F.2d at 527:

> "A deposit in a bank . . . does not deplete the estate of the depositor, but results in substituting for currency, bank notes, checks, drafts, and other bankable items a corresponding credit with the bank, which may be checked

**3.** The statute, note 1 *supra,* states that a preference exists only if all six statutory elements are present:

"(1) There must be a transfer of the debtor's property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt; (4) the transfer must be made or suffered while the debtor is insolvent, (5) within four months of bankruptcy; and (6) the effect of the transfer must be to enable the creditor to obtain a greater percentage of his debt than another creditor of the same class." *Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823, 834–35 (5 Cir. 1959); 3 Collier on Bankruptcy § 60.02, at 758–59 (Moore ed. 1976).

**4.** The statute, note 1 *supra,* defines "transfer" broadly. It is meant to preclude ingenious methods of circumvention:

"All technicality and narrowness of meaning is precluded. The word is used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership and possession of another, and by which the result forbidden by the statute may be accomplished. . . ." *Pirie v. Chicago Title & Trust Co.,* 182 U.S. 438, 444 (1901).

Accord, *National Bank of Newport v. Herkimer Bank,* 225 U.S. 178, 184 (1912).

**5.** The district court focused on the set-off itself and inquired whether *it* constituted a transfer. The district court did not explicitly consider whether the *deposits* amounted to transfers within the meaning of the Bankruptcy Act. We shall include in our analysis whether the deposits were transfers, as have most of the courts in similar cases.

**6.** We agree with the trustee's subordinate contention on appeal, as an alternative to his main contention that the court applied an erroneous legal test, that the bank should not have been granted summary judgment even under the test articulated by the court. The trustee's allegations about Famighetti's continuous knowledge of the course of Oakland's accelerating financial difficulties and his communications with Brede, if proven, would satisfy the requirement of the district court's legal test that there be dealings outside the regular course of the bank's business or complicity between Brede and the bank. These allegations raised a sufficient question of fact to make summary judgment inappropriate even under the district court's test.

against . . . . A deposit of funds differs from a payment in the essential particular that it is withdrawable at the will of the depositor."

All of the courts that have relied on a debtor-creditor relationship between bank and depositor to preclude a finding of a transfer have emphasized not only the requirement that the funds be withdrawable at the will of the depositor but also the requirement that the deposits be made in the regular course of business. See, e. g., *Mayo v. Pioneer Bank & Trust Co., supra,* 270 F.2d at 836. Various irregularities might defeat the presumption that deposits ordinarily do not have the effect of diminishing the bankrupt's estate and therefore are not transfers. Certainly when withdrawals are not permitted the deposits constitute payment, for they cannot be said to be in the regular course of business or to establish a mere debtor-creditor relationship between the bank and the depositor. E. g., *Mechanics' and Metals National Bank v. Ernst,* 231 U.S. 60, 67 (1913). But the fact that withdrawals *are permitted* does not make mandatory the opposite conclusion that the deposits *cannot* be considered transfers. See *Merrimack National Bank v. Bailey,* 289 F. 468, 470 (1 Cir.), *cert. denied,* 263 U.S. 704 (1923).[7]

In deciding whether a bank's set-off is a "transfer", a court must determine from all the circumstances whether the deposits were made in the regular course of business. In view of the purpose of the inquiry, it does not make sense to consider only the bank's course of business. If the deposits somehow are out of the regular course of the depositor's business, the bank's normal procedures, or the usual course of dealings between the depositor and the bank, then an inference can be drawn that the deposits were not ordinary deposits but served to transfer the depositor's property to the bank. By limiting its inquiry to the regular course of the bank's business, the district court below failed to take into account that "a deposit may be made the cloak for some other transaction, such as payment or the giving of security; and in such case equity, which looks through form to substance, will treat the transaction according to its real nature." *Citizens' National Bank of Gastonia v. Lineberger, supra,* 45 F.2d at 527–28.

The bank insists here that a deposit will constitute a transfer under § 60(a)(1), only if the trustee can prove the bank's complicity in, agreement to, or conscious awareness of, the build-up in the account in anticipation of a set-off. That is not the law. If it were, equity would be precluded from looking through form to substance— even in a case of as blatant a preferential transfer as that alleged by the trustee here.

In many cases a bank has been held to be privy to the building up of a depositor-debtor's account and therefore not to have accepted or received the deposits in the regular course of business. E. g., *Mayo v. Pioneer Bank & Trust Co., supra,* 270 F.2d at 834; *Bank of Commerce v. Hatcher,* 50 F.2d 719 (4 Cir. 1931); *Blue v. Herkimer National Bank,* 30 F.2d 256 (2 Cir. 1929), *cert. denied,* 281 U.S. 750 (1930); *Elliotte v. American Savings Bank & Trust Co.,* 18 F.2d 460, 462 (6 Cir. 1927); *Bank of California v. Brainard,* 3 F.2d 3, 4 (9 Cir. 1925); *In re Almond-Jones Co.,* 13 F.2d 152, 156

---

7. In *Merrimack, supra,* 289 F.2d at 470, the First Circuit rejected the bank's arguments which were similar to those of the bank in the instant case:

"On analysis, the [bank's] claim falls little short of contending that a creditor-depositor bank cannot become a preferred creditor, because it may honor checks on the deposits . . . . We cannot accept this proposition. The fact that such bank creditors may honor checks on such deposits does not control. In this case, checks to cover these deposits were not drawn and paid . . . . .

Bank creditors are subject to exactly the same rule of law as to preferences and set-off as are merchandise and other creditors. The different relations arising out of the fact that a bank creditor is also commonly a depositor debtor may require a somewhat different assessment and application of the evidential facts. But in all such cases of preference by set-off the fundamental question is one of fact . . . .."

(D.Md.1926), aff'd sub nom. *Union Trust Co. v. Peck,* 16 F.2d 986 (4 Cir.), *cert. denied,* 273 U.S. 767 (1927); cf. *Goldstein v. Franklin Square National Bank,* 107 F.2d 393 (2 Cir. 1939) (case remanded for factfinding as to the bank's intent in accepting deposits and its knowledge of the depositor's insolvency), *on remand,* 31 F.Supp. 66 (E.D.N.Y. 1940) (findings of no intent to set off deposits against debt *and* no reasonable cause to believe depositor was insolvent). A bank's participation in the build-up, however, is not a prerequisite to a finding that there has been a transfer. The question has been posed as whether the account of the bankrupt was built up "with the understanding of the Bank". *Farmers Bank of Clinton v. Julian,* 383 F.2d 314, 324 (8 Cir.), *cert. denied,* 389 U.S. 1021 (1967); see *Jensen v. State Bank of Allison,* 518 F.2d 1, 4 (8 Cir. 1975). The query in each of those cases amounted to dictum because there was *no* evidence that the funds were accepted by the bank *or* deposited by the bankrupt other than in the regular course of business of either. In both *Julian* and *Jensen,* upon which the district court relied, the bank accounts were long-standing, active accounts; in each case the Eighth Circuit emphasized that there was no intent on the part of the depositor *or* the bank, let alone an agreement between them, to use the deposits as a cloak for payment of a debt.

We find those cases to be distinguishable from and therefore not controlling on the issue presented by the instant case.

Here the trustee alleged facts from which it could be inferred that the bankrupt did not make the deposits in its Glen Head account in good faith; that the deposits were not made in the regular course of its business, which already had practically ceased functioning, see *Merrimack National Bank v. Bailey, supra,* 289 F. at 470; *Cardozo v. Brooklyn Trust Co.,* 228 F. 333, 334 (2 Cir. 1915); that the deposits were unusual in the course of dealings between Oakland and the bank; and that Brede intended the deposits to serve as payment of his company's indebtedness to the bank. The bank's contention that the intent of the depositor is irrelevant misses the point.[8] If all six elements of a preference under § 60(a) exist, a preference will be found despite lack of intent on the part of the bankrupt to effect a preference. Here, the intent of the depositor is relevant in proving one element of a § 60(a) preference—that the deposits were transfers—by showing that Brede never intended to withdraw the funds. If a depositor fully intends to leave the deposits in the account, available for set-off, they constitute payments on account of an antecedent debt whether or not at the time the deposits are made the bank knows it.[9]

8. The Supreme Court has recognized the significance of the intent of a depositor in making deposits which later are challenged as preferences. See *Mechanics' and Metals National Bank v. Ernst,* 231 U.S. 60, 67 (1913); *Studley v. Boylston National Bank, supra,* 229 U.S. at 526, 527, 529. In *Cusick v. Second National Bank, supra,* 115 F.2d at 152, the court stated that a deposit may be a preferential transfer if "either the [depositor] or the Bank, at the time of the deposits, intended them to operate as a payment of the notes . . . ." The rule as stated in *Cusick* was reaffirmed in *Mayo v. Pioneer Bank & Trust Co., supra,* 270 F.2d at 836.

The question of the true nature of deposits calls to mind the query whether there is a sound when a tree falls in a forest (of oak[es] or just timbers) with no one near enough to hear it. Fortunately the purposes of the Bankruptcy Act point to the practical conclusion that when a depositor intends not to withdraw deposits those deposits should be treated as transfers for purposes of § 60(a). The trustee, of course, must prove such a state of affairs or of mind, just as he must prove the existence of each of the other statutory elements of a preference. See *Farmers Bank v. Julian, supra,* 383 F.2d at 324.

9. The bank's insistence here that there can be no transfer unless the bank is implicated in or aware of the build-up confounds the separate distinct requirements of § 60(a) and § 60(b). These sections have different elements because they have different functions in the scheme of the Act: both are concerned with a preference, but "[s]ubdivision (a) defines what shall constitute it and subdivision (b) states a consequence of it—gives a remedy against it." *Pirie v. Chicago Title & Trust Co., supra,* 182 U.S. at 446. Knowledge or notice on the part of the recipient of an alleged preferential transfer is an element of § 60(b), see note 1 supra, but not of § 60(a). *Pirie, supra,* 182 U.S. at 446.

*Matters v. Manufacturers' Trust Co.,* 54 F.2d 1010 (2 Cir. 1931), is not to the contrary.

### III.

We have considered the bank's other arguments and find them to be without merit.[10]

Nothing in this opinion is intended to express or imply any views on the part of the Court with respect to the result to be reached by the district court on remand. All we hold is that the trustee is entitled to his day in court and an opportunity to prove, if he can, a preferential transfer under § 60 of the Bankruptcy Act in accordance with the correct legal standard as stated in this opinion.

Reversed and remanded for trial.

---

There, in holding a bank deposit to be a preference under N.Y. Stock Corporation Law § 15, Judge Learned Hand stated that the New York statute differed from the federal Bankruptcy Act in that the latter "charge[s] the transferee only when in privity with the transferor; . . . if there is to be a recovery, the bank must understand that the account is being built up so as to be available at the proper time for seizure." *Id.* at 1013. Aside from the fact that this statement was dictum since the holding was based on New York law alone and not on § 60 of the Bankruptcy Act, the interpretation of the federal law is consistent with what we hold here. The knowledge to which Judge Hand adverted was the "reasonable cause to believe" requirement of § 60(b), which then was phrased to require that the transferee "have reasonable cause to believe that the . . . transfer would effect a preference." Bankruptcy Act § 60(b), as amended June 25, 1910, 36 Stat. 842. This is confirmed by Judge Hand's citation to *Kolkman v. Manufacturers' Trust Co.,* 27 F.2d 659 (2 Cir. 1928), another case under N.Y. Stock Corporation Law § 15, where the Court held the innocence of the bank to be irrelevant under § 15. The innocence of the bank was described in terms which indicated that the Court had in mind the "reasonable cause to believe" standard of § 60(b): "[The insolvent's check] was received in regular course of business . . . , the bank acting throughout in good faith and without knowledge of the financial difficulties of its depositor." *Id.* at 660.

Furthermore, Judge Hand's comments in *Matters* assumed that the deposit was one "over which the depositor means to keep full control". 54 F.2d at 1013. In such a case, as we have discussed above, the only practical way to prove that the deposits were outside the regular course of business is to prove that "the bank must understand that the account is being built up so as to be available at the proper time for seizure." *Id.*

10. For example, whether the bank had reasonable cause to believe that Oakland was insolvent is something that the trustee must prove at trial and is a question for the jury.

The bank also contends that it was Brede, not the bank, who received a preference. Even if Brede as guarantor of Oakland's note received a preference, that does not necessarily preclude a finding that the bank received one. In *Citizens' National Bank of Gastonia v. Lineberger, supra,* and in *Joseph F. Hughes & Co. v. Machen, supra,* the Fourth Circuit held that there had been no "transfer" to the banks because the deposits had been made and accepted in the regular course of business. The court reasoned, a fortiori, that there had been no preferential transfers to the guarantors of the depositors' notes. The court responded to the trustees' arguments that there had been preferences to the guarantors by saying that perhaps that would be the case if the funds had been deposited in the accounts with the intent to effect a preference. These cases do not hold that in such a situation the banks would not have received preferences. In the instant case, the trustee is entitled to prove, if he can, that the bank and Brede have been preferred and have diminished the assets of the bankrupt's estate, to the detriment of the other creditors.

---

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority that the granting of summary judgment was error and that this matter must be remanded for a full development of the facts on trial. However, I cannot agree with the majority's exposition of the law to be applied by the district court on remand.

The issue in this case is a simple one: *viz.,* were the deposits by Oakland in its checking account "transfers" within the meaning of § 1(30) of the Bankruptcy Act? 11 U.S.C. § 1(30). The majority holds that a unilateral decision by a depositor not to exercise his right to draw checks against his account transforms the bank, without its knowledge from a debtor to a transferee.[1]

1. The majority does not state whether the depositor can "untransfer" the transferred funds if he changes his mind and decides to draw checks against his account.

This does not accord with the "traditional rule" which is correctly set forth at the outset of the majority opinion; *i. e.*, "that in order to prove a voidable preference the trustee must show complicity or understanding on the part of the bank."

In the leading case of *New York County National Bank v. Massey*, 192 U.S. 138, 147, 24 S.Ct. 199, 201, 48 L.Ed. 380 (1904), the Court held that "a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it." Until the bank acts to restrict the right of the depositor to write checks against the account, the money on deposit remains the property of the depositor and he may draw against it. *United States v. Sterling National Bank & Trust Co.*, 494 F.2d 919, 922 (2d Cir. 1974).

The *Massey* court held that in the absence of a showing of fraud or collusion between the bankrupt and the bank aimed at creating a preferential transfer of the bankrupt's property, the deposits which he makes create an indebtedness on the part of the bank and do not diminish the bankrupt's estate. This holding requires, at the least, that there be some participation or understanding on the part of the bank before an ordinary deposit can be considered a transfer, and this is the generally accepted rule. 4 *Collier on Bankruptcy*, § 68.16 at 919–21; 3 *Remington on Bankruptcy* § 1474.4 at 472 (J. Henderson rev. 1957). We have accordingly stated that where a bank accepts a deposit with the intention of applying it on a preexisting claim against the depositor rather than holding it subject to his right of withdrawal, there may be a voidable preference. *See Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 557 (2d Cir. 1976) (citing *Goldstein v. Franklin Square National Bank*, 107 F.2d 393, 394 (2d Cir. 1939)). The test, as set forth in *Goldstein*, is whether the bank, in receiving the deposits, intends to apply them in payment or setoff of an outstanding indebtedness of the depositor. Ex-

pressed another way, the test is "[w]as the account of the bankrupt built up, with the understanding of the Bank, for the purpose of allowing the Bank to use it as an offset and thereby obtain a preference?" *Farmers Bank v. Julian*, 383 F.2d 314, 324 (8th Cir.), *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967).

Although the majority's attempt to do equity will penalize only the bank in the instant case, the burden of the rule which we now lay down will fall in the long run upon the depositor. A bank is not simply a repository of funds; it is a source of credit. The facts of financial life are such, however, that the businessman seeking credit is most likely to secure it at the bank where he is a depositor. H. Justman, *Comments on the Bank's Right of Setoff under the Proposed Bankruptcy Act of 1973*, 31 *Bus. Law.* 1607, 1611, & 1616 n. 54 (1976). This bank not only has the use of the deposited funds; it also has the right of setoff. *Jenson v. State Bank*, 518 F.2d 1, 4 n. 6 (8th Cir. 1975). The maintenance of an adequate balance in his demand account benefits the depositor as well as the bank, because the bank's right of setoff encourages it to continue credit when it might be induced otherwise to call its loans. If a businessman's efforts to create and maintain an adequate balance are, standing alone, to be construed as transfers of the funds involved, an inducement for the bank to work along with the financially troubled entrepreneur is removed. It was to encourage such cooperation that the bank's right of setoff was preserved when the Bankruptcy Law was amended by the Chandler Act in 1938. *See 4 Collier on Bankruptcy*, § 68.01(3). A right which Congress has refused to eliminate should not be eliminated by this Court in its stead.

I see no reason why the district court should be directed to depart from the rule laid down by this Court in *Goldstein, supra*, and approved only last year in *Miller, supra*.