James CISSELL, Trustee, Plaintiff,

v.

The FIRST NATIONAL BANK OF CINCINNATI, Defendant.

No. 7886.

United States District Court, S. D. Ohio, W. D.

July 25, 1978.

Robert R. Lavercombe, Cincinnati, Ohio, for plaintiff.

S. Arthur Spiegel, Cincinnati, Ohio, for defendant; William McD. Kite, Cincinnati, Ohio, of counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER, Chief Judge:

### INTRODUCTION

This is an action by the Trustee in Bankruptcy for World Academy and World Academy for Foreign Study (World) against the First National Bank of Cincinnati to recover certain payments made between March 13, 1970 and July 1, 1970, as voidable preferences within the meaning of § 60(a) and (b) of the Bankruptcy Act, 11 U.S.C. § 96.

In our prior Opinion in this case, we concluded that there were four triable issues of fact (doc. 64, at 18). Since resolution of the fourth of these issues (*i. e.,* whether payment to the Bank by means of the collateral account could operate as a valid set off "in good faith and in the ordinary course of business") might resolve the entire controversy, we determined to try that issue separately and so informed counsel (see letter of December 28, 1976). Counsel submitted memoranda on that issue (docs. 77 and 78), and the case was tried to the Court on March 7–9, 1977. In accordance with Fed.R.Civ.Pro. 52(a), we hereby submit the following findings of fact and conclusions of law. We also wish to take this opportunity to apologize to all counsel for our tardiness in rendering this Opinion. The issues involved, however, are perplexing. The issues also appear similar to those encountered in *Studley, Trustee in Bankruptcy of Collver Tours Co. v. Boylston National Bank,* 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313 (1913), and in *In re Putterman,* 46 F.2d 175 (S.D.N.Y.1930), only complicated by the Bank's claim that it is a secured creditor of the Bankrupt.

In *Studley,* the Collver Tours Company conducted around-the-world tours, charging

a lump sum for tickets, which were paid for in advance. The company had an account with the Boylston National Bank. Collver got a line of credit from the Bank. The company's borrowings fluctuated, the Bank lending more money on the basis of Collver's encouraging statements of its prospects. As Collver received money from the sale of the tickets, it deposited the money received in its general accounts at the Bank, not for the purpose of preferring the Bank or enabling the Bank to exercise a right of set-off, but in the expectation of its being used for carrying on the business.

Within four months of Collver's bankruptcy, Collver paid off some of its debt to the Bank by check. More payments were made by the Bank's act of charging Collver's deposit account, according to the custom of the Bank, of which Collver had notice and to which it assented. Total payments by these two methods equaled $22,500. Collver's trustee sued the Bank to recover the $22,500 claiming that the Bank had notice of Collver's insolvency and that the payments of $22,500 were voidable preferences.

The Court ruled that the parties could voluntarily make a set-off before the petition in bankruptcy was filed, by the Debtor's drawing checks on the account and paying the Bank, or by the Bank's charging outstanding notes to the Bankrupt's account.

The Court concluded that such payments from or set-offs against the Debtor's general accounts were not subject to attack as voidable preferences. The Court stated that a remedy for potential abuse is to be found in the fact that the Trustee is authorized to sue and recover if it can be shown that after insolvency money was deposited for the purpose of enabling a bank to secure a preference.

The rule of *Studley* can be found in *4 Collier's* ¶¶ 68.16–68.18 (1975). That rule is stated as follows:

[I]f the set-off is made before bankruptcy, whether a bank charges off the deposit of its customer and applies it on the indebtedness which it holds against the customer, or whether it draws a check in the name of the customer, covering his deposit and applies it as a credit on the indebtedness, the effect is the same. The bank may exercise its right by means of having the depositor draw a check on the account, payable to the bank, for the amount of the balance then standing to his credit and the bank may then apply such check to the amount owing by the bankrupt, and the transaction will be valid if made under circumstances indicating there is effort to consummate a valid set-off of the deposit. But if, on the other hand, the check is given under such circumstances as to indicate a transfer by indirection, constituting a payment of the bank's claim, payment by check will amount to a preference although if the bank had merely stood on its right of set-off in the subsequent bankruptcy proceedings, it would have been allowed.[1]

In the case of *In re Putterman*, 46 F.2d 175 (S.D.N.Y.1930), the District Court had occasion to examine a Bank's right of set-off against an account that was other than a general account of its Debtor. In *Putterman*, the Bankrupt maintained a general account with its lending bank. About 43 days before the filing of a petition in bankruptcy, the Bank closed the Bankrupt's general account. The money then in the general account together with such money as thereafter came in before bankruptcy were put in a "collateral account." The general account was closed because the Bankrupt's notes were due and the Bank knew that the Bankrupt could not pay them. The Court ruled that the deposits received by the Bank after the closing of the Bankrupt's "regular

---

1. It is ironic that a bank might become worse off by taking what would seemingly be "prudent" action than it would be if it did not take a preference but instead waited and exercised a set-off. The law, however, judges the conduct of the parties "by what they did, not by what they might have done." *Bank v. Campbell*, 81 U.S. (14 Wall) 87, 20 L.Ed. 832 (1871), cited in *In re National Lumber Co.*, 212 F. 928, 929 (3d Cir. 1914). *See also 4 Collier's* ¶ 68.16[2]–[2.1], at 915–26 (1975).

account" and the opening of the "collateral account" were received for the purpose of applying the moneys so received to the Bankrupt's debt to the Bank. The Court found that the Bank knew the Bankrupt was insolvent, and had reason to believe that its act created a preference for it. This was the sort of "abuse" case that was mentioned in *Studley*. Here the deposit was not in a general account, made in the regular course of business, and subject to the Bankrupt's withdrawal, at will, by check. *See* 85 A.L.R. 369, 380 (1933).

The notion that a bank has no right of set-off against deposits for a special purpose, such as in the case where a depositor's general accounts are closed and special accounts set up to enable the bank to secure a preference, is thoroughly discussed in *4 Collier's* ¶ 68.16[2.1] (1975). *See also Katz v. First National Bank of Glen Head*, 568 F.2d 964 (2d Cir. 1977).

The evidence shows that on November 14, 1969, the Bank renewed a loan to World for $200,000 and also loaned $300,000 more for a total of $500,000 to be repaid on or before March 31, 1970. Prior loans had been "secured" by certificates of deposit. The Bank took a security interest in "all accounts receivable then owned and thereafter acquired by the Debtor." On March 16, 1970, the maturity date was extended 30 days, if the company and its subsidiaries would pay, on account of the principal due, $100,000 in April and $200,000 once in May and once in June, 1970. The "subsidiaries" were World Academy for Foreign Studies, International School for Young Americans, Institute for Cultural Education, Waco Construction and Travel Rite International Products (Carlson Depo. [Cd.] 19–20).

Sometime prior to or on March 31, 1970, Grant W. Carlson, who performed the function of controller at World (Cd. 8), met with Mr. Rielag of the Bank at the Atlas Branch and discussed the plan for payment (Cd. 13–14). The plan was that the money in the checking accounts of World and its subsidiaries was to be placed in a "collateral account" run or controlled by the Bank. Any new funds coming in would be placed in the "collateral account." Ninety percent of these funds were student deposits or "pre-paid tuitions" on future trips (Cd. 21) (although some of these advance payments were trips that were to some extent in progress). Generally, no students were allowed overseas without full advance payment (Cd. 51). The Bank had total control over this account. Rielag was given cash flow projections and lists of accounts payable (aged), as well as a list of small creditors. After approving disbursements, Rielag would permit release of funds from the collateral account to the general account. Rielag set the account up after exhibiting concern for World's financial status (Cd. 15), and either set up or confirmed (it is unclear which) the schedule of repayments in April, May and June, except by then Rielag indicated that the "collateral account" had to have a $200,000 balance up to June 1.

As far as World's financial status is concerned, there is the following evidence, all of which Rielag was privy to. Documents showed that as of September, 1969, the net worth of World was $744,000. A cash flow report dated April 2 and 3 showed a projected cash flow April-September, 1970 that indicated a cash position for September 30, 1970 of negative $1,200,000 (Cd. 24–5). In a balance sheet for the period ending September 30, 1969, Peat, Marwick and Mitchell opined that the continuation of the business as a going concern was dependent on additional equity capital and future profitable operations. There were serious discussions between Carlson and Rielag about cash flow and timing of incoming revenues (Cd. 27). A May 4 document showed that the May 31 cash position was estimated to be $24,000. This was dangerously low according to Carlson, and he and Rielag probably discussed it (Cd. 36). At the end of April, it was estimated that the cash position would be $600,000. It turned out to be $400,000 (Cd. 36–7). According to Carlson, World was not meeting its payables in April and May, as they became due (Cd. 39), and Rielag must have known that from the list of aged payables he was given. As of March 31, $322,000 was due, $201,000

of which was 90 days old (Cd. 39–40), which was not normal trade practice (Cd. 40). Furthermore, Carlson's own deposition indicates that he was aware that World couldn't meet its current obligations (Cd. 38, 39).

According to Carlson, an air of secrecy surrounded the "collateral account" (Cd. 47). A March 23, 1970 estimate for profit and loss estimated a loss for the year of $1,434,000. Projected net worth for the end of the fiscal year was a negative. Notwithstanding the above, Carlson said he didn't know that the operation was untenable until July 6 (Cd. 68).

There was testimony that three major investors put in $2,000,000 for capital stock (Cd. 53) the summer prior to bankruptcy, although they expressed alarm at the cash situation (Cd. 54). The Bank's president, Mr. Liggett, said he could not recall telling Mr. Fish, a company official, that he (Liggett) should "pull the string" on World because it was insolvent, but he did agree that the collateral account was set up to protect the Bank's debt. In his deposition, he had said it was to keep the World people from siphoning off money for "improper purposes."

Rielag said that the collateral account was set up due to the decrease in net worth, the cash flow problems, the enrollment projections, that further equity was not expected to be forthcoming and that there had been a change in management.

Rielag testified that the Bank took "its money" and closed or "blocked" the general account, leaving enough to cover outstanding checks. The deposit in the collateral account was $275,020.11 on or about March 31, 1970. He said he felt that the Bank's debt was "insecure" but also said he was acting on the theory that they were secured and could do what they did.

According to Carlson, $104,000 was paid to the Bank on April 1, and $402,500 was paid in May, because he did not want to wait until June 1 and incur more interest. The payments were made from the Debtor's general account after money was released from the control account. The Bank was repaid by May 8, at which time the collateral account was closed and money left over ($60,531.60) was put into World's general accounts. Somewhere in the neighborhood of $3,500,000 passed through the general account between May 8 and July 7 (the date of bankruptcy). There was $268,000 in the general account on July 7, 1970.

The confusing aspect of this case arises from the Bank's claim that it was a secured creditor and held a perfected security interest in the pre-paid student tuitions as "accounts receivable." An account or account receivable is defined as "[the] right to payment for goods sold or leased or for services *rendered* which is not evidenced by an instrument or chattel paper." Ohio Rev. Code § 1309.01(A)(10) (UCC 1962 draft 9–106). The Trustee contended that the pre-paid student tuitions were contract rights, which are defined as "any right to payment under a contract *not yet earned* by performance and not evidenced by an instrument or chattel paper." Ohio Rev.Code § 1309.01(A)(11). The Court agreed with the Trustee that until the debtor had earned the pre-paid tuitions by delivering what the students paid for, such sums were not accounts, although with performance the contract rights ripened into accounts. *See Industrial Packaging Products Co. v. Ft. Pitt Packaging International, Inc.*, 399 Pa. 643, 161 A.2d 19 (1960); *In re Varney Wood Products*, 458 F.2d 435 (4th Cir. 1972). *See also* Ohio Rev.Code § 1309.25(A) (UCC 9–306), which states that an account is a proceed of a contract right when payment is earned. The Court then concluded that the Bank was unperfected in bankruptcy as to the contract rights because the secured party had only listed "accounts receivable" in his financing statement. *J. White and R. Summers, Uniform Commercial Code*, 843–44 (1972).

The Bank contends that the money in the general accounts (mostly [90%] pre-paid student tuitions) was its collateral and that it accelerated the indebtedness and took the collateral (¶ 1f of the Security Agreement). Alternatively, the Bank claims that it exercised a right of set-off when it put the

$275,020.11 from the general account into the collateral account. Such an exercise of a right of set-off is not inconsistent with a Bank's right to execute on its security. *See Jensen v. State Bank of Allison*, 518 F.2d 1 (8th Cir. 1975). The second theory, set-off, appears to have been arrived at completely after the fact. In light of the manner in which the Bank was paid off—approximately $100,000 in April, $200,000 on May 1 and $200,000 on May 8—the set-off theory (of $275,020.11 on March 30) won't wash.[2] The Court also rejects the theory that the Bank was simply executing or seizing its collateral by setting up the collateral account, not only because the Bank was not secured as to all the pre-paid student tuitions, but also because it appears from the evidence that the Bank was instead doing just what the Trustee contends it was doing—stepping in and controlling the Debtor's cash in order to secure repayment of its extended loan.

The Court concludes that the operation of the collateral account was to enable the Bank to secure a preference and that the deposits were therefore not in good faith or in the ordinary course of business. *In re Putterman*, 46 F.2d 175 (S.D.N.Y.1930); *4 Collier's* ¶¶ 68.16[2.1], 68.18 (1975).

The issues therefore remaining in this case are: (1) whether the bankrupt was insolvent at the time of the alleged preferential transfers; (2) whether the Bank had "reasonable cause" to believe that the Debtor was insolvent within the meaning of § 60(b), *see In re Hygrade Envelope Corp.*, 366 F.2d 584, 586–87 (2d Cir. 1966); and (3) the exact amount by which the Bank was unsecured.

---

**2.** The Court cannot understand and rejects another theory offered by the Bank—*i. e.*, that when the Bank returned money to the general account (May 8), it was extending new credit.